[No. D010598. Fourth Dist., Div. One. May 20, 1991.]

WILLIAM CLIFFORD JOHN MacDONALD, a Minor, etc., et al.,
Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

## COUNSEL

Thorsnes, Bartolotta, McGuire & Padilla and Frederic L. Gordon for Plaintiffs and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Marvin Goldsmith, Assistant Attorney General, Randall B. Christison, Luis R. Vargas and Kristin G. Hogue, Deputy Attorneys General, Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, Susan A. Crabtree and F. David Froman, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**HUFFMAN, Acting P. J.**—This appeal raises the question of whether the statutory scheme for licensing and inspecting day care facilities (Health & Saf. Code, § 1596.70 et seq.)[1] creates a privately enforceable mandatory duty on the part of governmental entities to discover and prevent harmful conduct that might injure children placed in such facilities by their parents. We answer this question in the negative and hold these statutes do not create a private right of action against the public entities on behalf of the injured child.

Plaintiff William Clifford John MacDonald (William) was 22 months old when his day care provider, defendant Patricia Vitela, severely burned his hands in scalding water. William (through his guardian ad litem) and his parents, plaintiffs Connie V. MacDonald and William S. MacDonald (the parents), brought a complaint for money damages on a number of theories against defendant Vitela, her husband George Vitela, and two public entities which were alleged to owe duties of care to the plaintiffs, defendants State of California (the state) and County of San Diego (the county). The trial court granted motions for judgment on the pleadings brought by the state and the county with respect to the two causes of action specifically alleged against them, negligence per se (based on Health & Saf. Code, §§ 1597.30, 1597.55, and former 1597.56)[2] and general negligence. Accordingly, the action as to the two public entities was dismissed.

---

[1]All statutory references are to the Health and Safety Code unless otherwise specified. This statutory scheme is known as the California Child Day Care Facilities Act (the act), section 1596.70 et seq.

[2]The Legislature has substantially amended and extensively renumbered these statutes since William's complaint was filed; however, the substantive provisions are largely unchanged. Section 1597.30 was formerly numbered section 1597.50 and is so referred to by William. Former section 1597.56 as relied on by William dealt with the creation of a complaint procedure; the current section of that number deals with compliance with the act. Complaint procedures are now governed by sections 1596.843 and 1596.853.

William and his parents[3] appeal the order of dismissal, contending the state and the county failed to discharge their mandatory duties to visit and oversee day care homes as required by sections 1597.55 and former 1597.56, thereby incurring liability for breach of those duties pursuant to Government Code section 815.6 (imposing liability for a public entity's breach of mandatory duties). In the alternative, if the duties owed by the state and the county to William are held to be discretionary rather than mandatory, William argues that certain immunities created by the Government Code (Gov. Code, §§ 820.2, 818.4, 818.2) cannot properly be found to bar this action at the pleading stage.

William further contends he had a special relationship with the state and the county arising from his status as a child in day care, or alternatively that the government had a special relationship with its licensee Vitela that required it to control her conduct. These special relationships are alleged to justify the imposition of duties of care on the state and the county to investigate and to "warn of dangers associated with, and make safe day care homes, as well as those individuals who operate said homes."

Our interpretation of section 1597.30 et seq. as applied to these facts leads us to conclude the Legislature did not intend by the enactment of this statutory scheme to create a mandatory duty, the breach of which could be redressed by a civil action for damages. Although sections 1597.55 and former 1597.56 contain mandatory language, it is well established that some apparently obligatory statutory language should properly be construed as not foreclosing a governmental entity's exercise of discretion. (*Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 910-911, fn. 6 [136 Cal.Rptr. 251, 559 P.2d 606].) That is the case here. Moreover, these public entities did not owe any duty to William based on a special relationship; thus, the immunity question is moot. (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197 [185 Cal.Rptr. 252, 649 P.2d 894].) We affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

The state's and the county's motions for judgment on the pleadings were addressed to William's first amended complaint.[4] Only the 11th and 12th

---

[3]Although the parents purport to join in William's appeal of the order, they as individuals have no standing to do so, because these particular causes of action were brought by William alone. Therefore, only William, acting through his guardian ad litem (his mother) may challenge the trial court's ruling on appeal.

[4]A demurrer had been sustained with leave to amend to the original complaint (filed Feb. 6, 1985). Those demurrer papers contained in the superior court file (of which we take judicial notice pursuant to Evidence Code section 459, subdivision (a)) reveal that Patricia Vitela was criminally charged, convicted, and sentenced for child abuse. The file also reveals that the state cross-complained against Vitela for negligence. However, it does not appear she or her husband ever appeared in this action nor that any judgment was ever entered against them.

causes of action of the 13 that are pled are directed at the public entities, at all times treating their alleged responsibilities under the statutes as identical.[5] (See § 1596.82, providing the state Department of Social Services (the Department) may contract with other governmental agencies to assume specified licensing, approval, or consulting responsibilities.)

In his 11th cause of action for negligence per se, William first pleads that on March 22, 1984, he received second and third degree burns, bruises, and psychological injuries while in the care of the Vitelas. He then alleges the state and the county owed him mandatory duties to establish, administer, and monitor a system for licensing day care homes that was consistent with the legislative purpose of ensuring the health and safety of children in such homes. In support of these claims, he sets forth excerpts from sections 1597.30 et seq. as follows:

"2. At all times herein mentioned, *California Health and Safety Code Section 1597.55* was in full force and effect and provided, in pertinent part, as follows:[6]

"No site visitations, or unannounced visits or spot checks, shall be made under this chapter except as provided in this section.

"(a) A site visitation shall be required prior to the initial licensing of the applicant.

"(b) An unannounced site visitation shall be required for the renewal of a license.

"(c). . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(d) The department or licensing agency shall make an unannounced site visitation on the basis of a complaint and a follow-up visit as provided in § 1597.56 [now § 1596.853] . . .

---

[5]The county has also treated these statutory provisions as equally affecting both the county and state; it has not filed a separate respondent's brief, instead joining in that filed by the state.

William's several causes of action brought solely against the Vitelas allege theories of assault, battery, false imprisonment, and the like. Although the ninth cause of action for negligent infliction of emotional distress recites that the parents presented the public entities with claims for their own losses incurred due to William's injuries, they have not pursued this theory individually against the government at the pleading or appellate stages.

[6]The current version of section 1597.55 in pertinent part is unchanged from the version William quotes, except that subdivision (a) now requires the site visitation shall be "announced," and subdivision (d) now references section 1596.853 instead of former section 1597.56.

"3. At all times herein mentioned, *California Health and Safety Code Section 1597.51* was in full force and effect and provided, in pertinent part, as follows: [7]

"The State Department of Social Services shall establish, administer, and monitor a program which licenses family day care homes for children consistent with the provisions of this chapter . . .

"4. At all times herein mentioned, *California Health and Safety Code Section 1597.56* was in full force and effect and provided, in pertinent part, as follows: [8]

"The department shall establish a procedure for the processing and handling of complaints which shall include a site visitation, a report filed on the complaint, and a follow-up visit to assure that any violation has been corrected.

"5. At all times herein mentioned, *California Health and Safety Code § 1597.50* [now renumbered section 1597.30] was in full force and effect and provided, in pertinent part, as follows:

"The legislature finds and declares:

"(a) It has a responsibility to insure the health and safety of children in family homes that provide day care."

William cites section 16 as an aid in interpretation of these provisions: " 'Shall' is mandatory and 'may' is permissive." He goes on to allege that before Vitela obtained her day care license, an infant in her care, Krystinea W., received a large red "handprint" mark on her face at the Vitela home. After Vitela was licensed, a complaint was made to the county and the state that another infant, Latoya M., incurred a spiral fracture of her arm while in the Vitelas' care. William claims the county and state breached their mandatory duties by failing to conduct a site visitation before issuing Vitela's license, failing to make a site visitation on the basis of the complaint about Latoya M., and failing to make a follow-up visit to assure any violation had been corrected. William then alleges his injuries were received as a proximate result of the state's and county's breaches of mandatory duties, and

---

[7]Former section 1597.51 has been renumbered section 1596.871 (amended by Stats. 1984, ch. 1615, § 12, p. 5753). Current section 1596.871 governs fingerprinting of individuals in contact with day care children. Current section 1596.80 et seq. provides for the administration of day care licensing, corresponding to former section 1597.51 relied on by William.

[8]See footnote 2, *ante*; the subject matter covered by former section 1597.56 is now covered by sections 1596.843 and 1596.853.

represented the type of harm that the statutory enactments were designed to prevent.

William's 12th cause of action pleads general negligence, claiming the state and the county owed William a duty to "investigate, inspect, monitor, control, supervise, oversee, administer, conduct, warn of dangers associated with, and make safe day care homes, as well as those individuals who operate said homes." Owing to the breach of those duties, William alleges, he received his injuries at Vitela's hands. It is further alleged that after William was injured, Vitela's day care license was suspended on an accusation involving the incidents with Krystinea W. and Latoya M. (§ 1596.886.)

The state and the county separately moved for judgment on the pleadings on the first amended complaint, attacking both the 11th and 12th causes of action for failure to state sufficient facts. They argued the applicable Health and Safety Code sections do not create an actionable mandatory duty and contended the purpose of the entire statutory scheme regarding family day care homes would not be furthered by a reading of the sections creating a private right of action for damages against public entities. The trial court agreed, granted both motions for judgment on the pleadings, and dismissed the action.[9] William timely appealed.

## DISCUSSION

■ In reviewing this order granting the motion for judgment on the pleadings and dismissing the action, we accept the facts alleged in the first amended complaint as true for the purposes of review. (*Nunn* v. *State of California* (1984) 35 Cal.3d 616, 620-621 [200 Cal.Rptr. 440, 677 P.2d 846].) We consider the face of the pleading to determine whether the facts alleged entitle the plaintiffs to any relief. (*Lehto* v. *City of Oxnard* (1985) 171 Cal.App.3d 285, 287-288 [217 Cal.Rptr. 450].) Applying these rules, we address separately the merits of William's cause of action for breach of mandatory duty and his related cause of action for general negligence.

### I

■ The basis of William's claim that mandatory duties were breached by the state and the county is Government Code section 815.6:

"Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury,

[9]The order of dismissal constitutes a judgment for all purposes, including review. (Code Civ. Proc., § 581d.)

the public entity is liable for any injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

The case law construing Government Code section 815.6 has developed "a three-pronged test for determining whether liability may be imposed on a public entity: (1) an enactment must impose a mandatory, not discretionary, duty [citation]; (2) the enactment must intend to protect against the kind of risk of injury suffered by the party asserting section 815.6 as a basis for liability [citations]; and (3) breach of the mandatory duty must be a proximate cause of the injury suffered." (*State of California* v. *Superior Court* (1984) 150 Cal.App.3d 848, 854 [197 Cal.Rptr. 914].)

Turning to the threshold question of the existence of a mandatory duty under the sections relied upon (§ 1597.30 et seq.), we are directed by the Supreme Court to resolve that issue as a matter of law. ■ "Whether a particular statute is intended to impose a mandatory duty is a question of interpretation for the courts." (*Nunn* v. *State of California, supra,* 35 Cal.3d at p. 624.)

"The legislative intent can usually be determined from the statutory language. (*Morris* v. *County of Marin* [1977] 18 Cal.3d [901] at p. 910.) However, when the specific language does not shed light as to the intent of the Legislature, it can be determined from other factors which indicate the intent of the Legislature. [Citation.] It is well established that statutes must be given a reasonable construction that conforms to the apparent purpose and intention of the law makers [citations], and the various parts of the statutory enactment must be harmonized by considering the particular clause in the context of the whole statute. [Citations.]" (*Nunn* v. *State of California, supra,* 35 Cal.3d 616, 624-625.)

Extensive case law has been developed on the existence of mandatory duties of governmental entities. In *Morris* v. *County of Marin, supra,* 18 Cal.3d 901, 908, the Supreme Court found the clear statutory language and evident purpose of Labor Code section 3800 imposed a mandatory duty on counties to ensure that applicants for building permits carry workers' compensation insurance. (*Id.* at pp. 906-907.) The court rejected the use of the distinction between mandatory and directory statutory provisions in any lawsuit where the goal is not to invalidate a specific governmental action that is subject to a procedural requirement. ■ In discussing that issue, the court used this broad definition of the terminology of Government Code section 815.6: "As used in section 815.6, the term 'mandatory' refers to an obligatory duty which a governmental entity is required to perform, as opposed to a permissive power which a governmental entity may exercise or

not as it chooses." (*Morris* v. *County of Marin, supra*, 18 Cal.3d at p. 908.) The court further qualified its definition of "mandatory" in a key footnote:

"[W]e do not hold that every statute which uses the word 'shall' is obligatory rather than permissive. Although statutory language is, of course, a most important guide in determining legislative intent, there are unquestionably instances in which other factors will indicate that apparently obligatory language was not intended to foreclose a governmental entity's or officer's exercise of discretion. . . ." (*Morris* v. *County of Marin, supra*, 18 Cal.3d at pp. 910-911, fn. 6.)

To illustrate its point in the footnote quoted above in *Morris*, the Supreme Court cited *Taliaferro* v. *Locke* (1960) 182 Cal.App.2d 752, 757 [6 Cal.Rptr. 813] (construing Gov. Code, § 26501) where statutory language providing a district attorney "shall" institute arrest proceedings was nevertheless held to imply an exercise of prosecutorial discretion.

The Supreme Court carried out a similar analysis in *Nunn* v. *State of California, supra*, 35 Cal.3d 616, 624-626, where it held a particular statute (Bus. & Prof. Code, § 7514.1), providing security guards "shall" be trained in firearm usage according to state regulations, did not require the state to enact such regulations within any particular time period. The court stated the statute should reasonably be interpreted to allow the state agency discretion to carry out its duties in promulgating the regulations as well as sufficient time flexibility to ensure the required rules would be adequate for the task. (*Nunn* v. *State of California, supra*, 35 Cal.3d at pp. 623-625.)

Likewise, in a case involving tragic facts not unlike William's injury, *Brenneman* v. *State of California* (1989) 208 Cal.App.3d 812 [256 Cal.Rptr. 363], the Court of Appeal declined to find a mandatory duty was created by the language of a California Department of Corrections Parole Procedures Manual-Felon, which "mandated an initial reassessment of the parolee's 'risks and needs' between 75 and 105 days from the date of release [from prison]." (*Id.* at p. 815.)[10] Such a reassessment was not done for a particular parolee, who, 111 days after his release, kidnapped, molested, and murdered a 12-year-old boy. The court held the language of the policy manual did not automatically trigger any specific requirement of agency action, noting:

[10]In *Brenneman* v. *State of California, supra*, 208 Cal.App.3d at pages 816-817, footnote 2, the court noted the rule embodied in Government Code section 815.6 (that " 'violation of a legislatively prescribed standard of care creates a rebuttable presumption of negligence' " (*ibid.*)) has been codified in Evidence Code section 669, subdivision (a). "Discussions of whether a mandatory duty exists under Government Code section 815.6 and whether a standard of care has been legislatively prescribed under Evidence Code section 669 are therefore interchangeable." (*Brenneman* v. *State of California, supra*, at 208 Cal.App.3d at pp. 816-817, fn. 2.)

"Any connection between the delay in reassessing [the parolee] and [his] conduct . . . is incurably speculative." (*Id.* at p. 818.) The court continued:

"The duty to conduct a reassessment is essentially a duty to investigate. A 'mandatory statutory duty to "investigate" . . . may not reasonably be read as imposing a mandatory duty . . . to *take action* . . . .' (*State of California* v. *Superior Court* (1984) 150 Cal.App.3d 848, 858 [197 Cal.Rptr. 914], italics in original.) Moreover, breach of a duty to investigate is not a proximate cause of injuries flowing from the failure to prevent certain conduct by the object of investigation. (*Id.* at pp. 856-859.)" (*Brenneman* v. *State of California, supra,* 208 Cal.App.3d at p. 818.)[11]

Similarly, in *Tirpak* v. *Los Angeles Unified School Dist.* (1986) 187 Cal.App.3d 639, 642-643 [232 Cal.Rptr. 61], the court found no mandatory duty was created by Education Code sections (Ed. Code, §§ 48200, 48900, 48911, 48918) which, in mandatory language, provide for children's access to an educational setting as well as a set of suspension and exclusion procedures designed to provide due process. The court accepted the defendant school district's argument that those sections were provisions directed toward attaining stated educational goals, not safeguards against injuries of any particular kind. (*Tirpak* v. *Los Angeles Unified School Dist., supra,* 187 Cal.App.3d at p. 643.)

Further, in *Fox* v. *County of Fresno* (1985) 170 Cal.App.3d 1238, 1243-1244 [216 Cal.Rptr. 879], the court analyzed section 17980 (pertaining to abatement of a nuisance) for the presence of any mandatory duty. The court found that although the term "shall" was used to require an enforcement agency to initiate corrective proceedings, "the statute taken as a whole militates against mandatory interpretation." (*Fox* v. *County of Fresno, supra,* 170 Cal.App.3d at p. 1243.) The statute gave the agency a choice of courses of action to take when violations were found; accordingly, a discretionary duty was created. (See also *Rose* v. *County of Plumas* (1984) 152 Cal.App.3d 999, 1007 [199 Cal.Rptr. 842] [holding Pen. Code, § 13518 imposed only an affirmative duty on a peace officer to receive training in first aid, not a mandatory duty on an officer to render aid]; *Lehto* v. *City of Oxnard, supra,* 171 Cal.App.3d 285, 292-295 [holding police departmental or municipal policy directives did not create a mandatory duty to individual citizens]; cf. *Elton* v. *County of Orange* (1970) 3 Cal.App.3d 1053 [84 Cal.Rptr. 27] [to be discussed, *post*].)

---

[11]In *State of California* v. *Superior Court, supra,* 150 Cal.App.3d 848, 854-859, cited above, the court concluded no actionable mandatory duty to investigate was created by the obligatory language of Business and Professions Code section 10176, because of a lack of proximate cause between the failure to investigate and the harm suffered by plaintiffs (unlawful misappropriation of their funds by a real estate licensee).

■ In determining whether section 1597.30 et seq. created any actionable mandatory duties, we apply the analysis developed in the cases discussed above. We examine whether the statutory language shows any legislative intent to create a mandatory duty enforceable by a private plaintiff like William. (*Nunn* v. *State of California, supra,* 35 Cal.3d at pp. 624-625.) We consider the particular clauses cited in the context of the whole statutory scheme. (*Ibid.*) It is first apparent that the language of section 1597.30, setting forth the Legislature's declaration that "It has a responsibility to ensure the health and safety of children in family homes that provide day care," is a general declaration of policy goals, rather than safeguards against injuries of any particular kind. (*Tirpak* v. *Los Angeles Unified School Dist., supra,* 187 Cal.App.3d 639, 642-643; *Ibarra* v. *California Coastal Com.* (1986) 182 Cal.App.3d 687, 694 [227 Cal.Rptr. 371].) William cannot create a mandatory duty from such a general statement of legislative policy.

Nor can William rely on the general requirements for licensing of day care providers (former § 1597.51, now § 1596.871 and § 1596.80 et seq.; see fn. 7, *ante*) to create any mandatory duty directly owed to a particular day care child like William. Such licensing activities are generally considered to be discretionary rather than mandatory. (*Morris* v. *County of Marin, supra,* 18 Cal.3d at p. 916; see Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) § 2.45, pp. 99-102.) Although licensing procedures must involve some ministerial activities as well as discretionary decisions, the Supreme Court has warned of the futility of the courts "enmesh[ing] ourselves deeply in the semantic thicket of attempting to determine, as a purely literal matter, 'where the ministerial and imperative duties end and the discretionary powers begin. . . .' " (*Johnson* v. *State of California* (1968) 69 Cal.2d 782, 788 [73 Cal.Rptr. 240, 447 P.2d 352].) It is, however, clear that the predominant character of licensing is discretionary. (See Gov. Code, § 818.4, providing for immunity for licensing decisions.) We are not persuaded that the provisions of former section 1597.51 or its current version create privately enforceable mandatory duties.

William next argues a mandatory duty is created by former section 1597.56, requiring the state or its delegatee to establish procedures for processing and handling complaints including a site visit, a report, and a follow-up visit. (See fn. 2, *ante*.) Such a claim is barred by the reasoning in *Nunn* v. *State of California, supra,* 35 Cal.3d 616, 624-626, where the Supreme Court discussed the discretionary nature of the promulgation of regulations. Moreover, the mere establishment of complaint procedures for the public does not ensure they will be followed or effective, or create a duty running specifically to a child like William. (See our discussion of the remaining prongs of the three-prong test of *State of California* v. *Superior Court, supra,* 150 Cal.App.3d 848, 854, *post.*)

William's strongest claim to the creation of mandatory duties in this statutory scheme is based on section 1597.55, providing site visitations "shall be required" prior to initial licensing (allegedly not done after Krystinea W.'s injury), upon renewal of a license, and upon the basis of a complaint, with a follow-up visit also to be made (allegedly not done after Latoya M.'s injury and complaint). However, as a threshold matter, the linkage of these visits with discretionary licensing activities creates substantial doubt that any privately enforceable mandatory duty could have been intended when the statutory scheme is read as a whole. (*Nunn* v. *State of California, supra,* 35 Cal.3d at pp. 624-625; *Fox* v. *County of Fresno, supra,* 170 Cal.App.3d 1238, 1243-1244.) The evident purpose of these sections was to create a licensing scheme that would promote the safety and well-being of all day care children. However, execution of the duties to visit day care homes and investigate complaints necessarily involves some exercise of discretion in deciding what action to take, and when, to evaluate and assess a particular situation. A party disagreeing with or harmed by the exercise or nonexercise of such discretion has not explicitly been provided any remedy in damages by the Legislature.

Moreover, as explained in *Brenneman* v. *State of California, supra,* 208 Cal.App.3d at page 818, and *State of California* v. *Superior Court, supra,* 150 Cal.App.3d 848, 858, a mandatory duty to investigate is not the same as a mandatory duty to take action after the investigation. The Department is afforded the discretion under section 1596.885 et seq. to suspend or revoke a license upon specified grounds, pursuant to specified procedures. Thus, even if the required site visitations had been made, it would have been up to the discretion of the Department to follow enforcement procedures. (See *State of California* v. *Superior Court, supra,* 150 Cal.App.3d 848, 858-859.) Thus, the Department's exercise of discretion has not been foreclosed by the apparently obligatory language of section 1597.55. (*Morris* v. *County of Marin, supra,* 18 Cal.3d at pp. 910-911, fn. 6.)

Therefore, we conclude the language of section 1597.30 et seq. does not impose a mandatory duty on these public entities that may be enforced by William in this civil action. Assuming for the sake of argument, however, that section 1597.55 or another of the cited sections does impose a mandatory duty on the state and county, we shall discuss the remaining two prongs of the three-part test enunciated in *State of California* v. *Superior Court, supra,* 150 Cal.App.3d 848, 854: (2) the enactment must intend to protect against the kind of risk of injury William suffered, and (3) breach of the mandatory duty was a proximate cause of his injury.

With respect to the enactment's scope of protection against the kind of injury suffered, the analysis in *Tirpak* v. *Los Angeles Unified School Dist.*

*supra*, 187 Cal.App.3d 639, 643-645, is instructive. There the court found certain provisions of the Education Code were administrative in nature, were intended to attain the goals stated by the Legislature, and were not designed to protect students and their parents from money damages stemming from alleged educational injuries incurred after the breach of those provisions. (See also *Keech v. Berkeley Unified School Dist.* (1984) 162 Cal.App.3d 464, 471 [210 Cal.Rptr. 7], holding it was improper to transform "statutory procedural provisions for special educational assessment into springboards for private damage suits. [Citation.]") Thus, the court in *Tirpak* found no private cause of action for damages had been stated, and that the proper remedy to redress a breach of the statutory provisions would have been to proceed in administrative mandamus or seek injunctive relief. (*Tirpak v. Los Angeles Unified School Dist.*, *supra*, 187 Cal.App.3d at p. 645.) While it is admittedly (and sadly) too late to seek to prevent the specific injuries William suffered by way of proceedings in mandamus or injunction, we nevertheless see no indication in the statutory scheme that the Legislature intended to make the state or county liable in damages for Vitela's conduct.

Finally, on the issue of whether proximate cause is adequately pled under these facts, the analysis in *State of California v. Superior Court*, *supra*, 150 Cal.App.3d 848, 857, is helpful. ██ " ' " 'Proximate cause is legal cause, as distinguished from the laymen's notion of actual cause, and is always, in the first instance, a question of law.' " [Citations.] Proximate cause " 'is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury [or damage complained of] and without which such result would not have occurred.' " [Citation.]' " (*Ibid.*) In *State of California*, *supra*, the court found only a tenuous causal link between the mandated investigation and the harm complained of and ruled as a matter of law this link was insufficient for imposition of a mandatory duty.

Similarly, as stated in *Brenneman v. State of California*, *supra*, 208 Cal.App.3d 812, 818, breach of a duty to investigate cannot be deemed to be the proximate cause of injuries which flow from the failure to prevent certain conduct by the subject of the investigation. Performing the required site visitations might have disclosed physical problems at Vitela's premises but would have been unlikely to reveal her abusive conduct or any psychological problems she was suffering. ██ This statutory scheme does not appear to have been intended to serve the function of a psychological evaluation of the fitness of a day care provider. Any causal link between the breach of the duties alleged and William's injury has not been demonstrated and it would

not be appropriate to impose liability for Vitela's conduct on the state and county.[12]

We are aware of the holding in *Elton* v. *County of Orange, supra,* 3 Cal.App.3d 1053, decided by this court in 1970 (before *Morris* and *Nunn* were issued). In *Elton,* we held that a dependent child placed in a foster home where she was tortured and abused had stated a cause of action for breach of a mandatory duty by the county which placed her there, based on the county's "alleged failure to perform the inspection, supervision and control functions required by the state regulations [currently Cal. Code Regs., tit. 22, ch. 7.5, § 87000 et seq.]." (*Elton* v. *County of Orange, supra,* 3 Cal.App.3d at pp. 1056-1060.) We believe *Elton* is distinguishable from this case because of the greater involvement there of the governmental entity; placing dependent children in licensed foster homes is different in kind and degree from the state's and county's licensing and related inspection duties with regard to family day care homes. (See *Johnson* v. *State of California, supra,* 69 Cal.2d 782, 785-786.) In any case, we are confident our statutory analysis of section 1597.30 et seq. is correct. This pleading fails to allege an actionable mandatory duty that proximately caused these injuries.

## II

■ Our analysis of William's general negligence cause of action (his 12th) begins with an assessment of whether the state and county owed him a duty to protect him against the harm suffered. (*Davidson* v. *City of Westminster, supra,* 32 Cal.3d 197, 201-202.) Only if a duty exists may we reach the issue of whether any statutory immunities (e.g., Gov. Code, §§ 820.2, 818.4, 818.2, as alleged here) apply to the challenged conduct. (*Lehto* v. *City of Oxnard, supra,* 171 Cal.App.3d 285, 289-290.)

Here, William has based his claim that a duty exists between the public entities and himself on the law concerning special relationships (e.g., *Lopez* v. *Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780 [221 Cal.Rptr. 840, 710 P.2d 907]).

"As a general rule, one owes no duty to control the conduct of another nor to warn those endangered by such conduct. Such a duty may exist, however, if '(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the

---

[12]These facts do not present and we therefore do not decide the scope of any possible mandatory duties owed to day care children under section 1597.55 where the condition of the day care premises, as opposed to the conduct of the day care operator, resulted in the injuries complained of.

other a right to protection.' [Citations.]" (*Lehto* v. *City of Oxnard, supra,* 171 Cal.App.3d at pp. 289-290.)

William contends his pleading meets these criteria because of "the unique circumstances of family day care and the statutory scheme to 'ensure the health and safety of children in family homes that provide day care.'" He argues the government had a special relationship with Vitela requiring it to control her conduct, since he was a foreseeable victim of her abuse and, alternatively, that he, as a child in need of protection, had a special relationship with the government. Thus, he claims, a duty to investigate and to warn was created (relying on *Johnson* v. *State of California, supra,* 69 Cal.2d 782, 784-785, a case involving the state's duty to warn a foster parent of the dangerous tendencies of a youth officially placed in her care).

We disagree. These public entities assumed no duty of care toward William that was greater than that owed to any other member of the public. (*Hartzler* v. *City of San Jose* (1975) 46 Cal.App.3d 6, 10 [120 Cal.Rptr. 5].) They did not engage in any affirmative acts which placed William in peril or increased the risk of harm to him. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137]; *Lopez* v. *City of San Diego* (1987) 190 Cal.App.3d 678, 681 [235 Cal.Rptr. 583]; *Stout* v. *City of Porterville* (1983) 148 Cal.App.3d 937, 942 [196 Cal.Rptr. 301]; *Baker* v. *City of Los Angeles* (1986) 188 Cal.App.3d 902, 907-909 [233 Cal.Rptr. 760].) There was no heightened duty of care to this child based on any individualized placement of him by the government into a position of peril. (*Johnson* v. *State of California, supra,* 69 Cal.2d 782, 785-786.) Requiring a public entity to enforce regulations designed to promote safety does not transform the agency into an insurer of safety. (*Bonds* v. *State of California* ex rel. *Cal. Highway Patrol* (1982) 138 Cal.App.3d 314, 320 [187 Cal.Rptr. 792].) Settled law does not permit the finding of a special relationship and the accompanying duties of care on the facts as pled. Nor does it appear that any amendment would improve William's claims either as to this issue or the mandatory duties pled.

Because we find no duty was created by the public entities' assumption of the statutory obligations of licensing and overseeing day care facilities, we need not reach the issues concerning governmental immunity briefed by the parties.

### DISPOSITION

The order is affirmed.

Froehlich, J., and Nares, J., concurred.