Filed 2/10/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION SIX

| | |
|---|---|
| ERIC TUTHILL et al., | 2d Civil No. B239668 |
| Plaintiffs and Appellants, | (Super. Ct. No. CIV226198) |
| | (Ventura County) |
| v. | |
| THE CITY OF SAN BUENAVENTURA et al., | |
| Defendants and Appellants. | |
| VICKI YOUNKER, | |
| Plaintiff and Respondent, | (Super. Ct. No. CIV227377) |
| | (Ventura County) |
| v. | |
| THE CITY OF SAN BUENAVENTURA et al., | |
| Defendants and Appellants. | |
| JASON GRANT et al., | |
| Plaintiffs, | (Super. Ct. No. CIV226183) |
| | (Ventura County) |
| v. | |
| THE CITY OF SAN BUENAVENTURA et al., | |
| Defendants. | |

Equity, although designed to promote justice, cannot be used to nullify a contrary statute. Applying equitable principles, the trial court awarded damages and private attorney general fees to plaintiffs Eric and Karrie Tuthill and Vicki Younker against defendants City of San Buenaventura and its housing authority (collectively, "the City") based on the City's failure to disclose affordable housing restrictions that applied to plaintiffs' townhomes. The judgment abrogated the statutory scheme of public entity immunity embodied in Government Code section 815 et seq. and must be reversed.[1] The Tuthills' appeal, which seeks additional damages, is moot.

---

[1] All statutory references are to the Government Code unless otherwise stated.

*The Affordable Housing Program*

The City's development and maintenance of an Affordable Housing Program ("AHP") is the backdrop of the litigation. In 1979, the California Legislature, having determined that a critical need for affordable housing exists in California, enacted statutes that offered incentives for cities to provide affordable housing for low- and moderate- income households. Those statutes are codified in the Density Bonus Law (§§ 65580 et seq.) In 1981, the City adopted the AHP, which provided incentives for private developers to produce more affordable housing.

In 1988, the City amended the AHP. The Amended AHP states its purposes: "to assist in providing ownership and rental housing for low and moderate income households and to ensure that such housing remains in the affordable market." The Amended AHP offered developers even stronger incentives to develop affordable housing. It also imposed threshold requirements for developers who wanted to take advantage of those incentives. The most significant of these were the requirements that developers impose price restrictions on affordable housing units and restrictions on resale prices, the latter to prevent owners from selling the units for more than a predetermined price. The Amended AHP required the City to "[s]et and periodically update the requirements and qualifications for eligible households" and to "[r]eview records submitted by developer and applicant households to identify eligible households."

In 1992, the City entered into a development agreement with now-defunct Bulmer Development Corporation ("Bulmer") to develop a 57-unit townhome complex called Seneca Highlands. The Development Agreement includes a Declaration of Covenants, Conditions and Restrictions (CCRs) that provide the affordability restrictions for the units.[3] The central purpose of the Development Agreement was the provision of

---

[2] Virtually all of the facts were undisputed and, with the documentary evidence, were received by stipulation of the parties.

[3] The CCRs were later amended. The Development Agreement and the Amended CCRs are together referred to hereinafter as "the Development Agreement."

affordable housing: Fifty of the units are designated as "moderate income" and seven as "low-income."

The Development Agreement provides that (1) only qualified buyers (those with incomes in a specified range) can buy any of the 57 units; and (2) no unit can be sold at a price above certain set limits. Through the Development Agreement the City delegated to Bulmer the discretion to make eligibility determinations, which is customary in the affordable housing industry, and to inform the City of those designations. The Development Agreement also required the City to issue a Certificate of Compliance, certifying that the prospective purchase complies with the Development Agreement. The parties agree that Bulmer misinformed the City about buyer qualifications in several cases, resulting in the City's improper issuance of Certificates of Compliance and the sale of restricted properties to buyers who were not qualified for AHP units because their income levels exceeded AHP qualifying income levels.

Plaintiffs purchased two of the seven "low income" Seneca Highlands townhomes in 2001. Because of the misunderstanding, they paid more than the restricted prices. Later that year, plaintiffs and other homeowners in Seneca Highlands discovered that Bulmer's sales agents had not disclosed that the townhomes were affordable housing units with price restrictions.

Plaintiffs sued the City and Bulmer in 2004.[4] The causes of action directed against the City in each complaint were declaratory relief, negligence and negligence per se/violation of statutory duty. In their declaratory relief cause of action, plaintiffs sought a declaration that the AHP's restrictions did not apply to their units and were not enforceable, or, if the court enforced the restrictions, monetary damages. The negligence cause of action was dismissed at trial. In their negligence per se/violation of statutory duty cause of action, plaintiffs alleged the City breached its "affirmative obligation" under California's affordable housing statute, section 65580 et seq., "to enforce the

---

[4] Bulmer did not appear and is in default as against plaintiffs. Bulmer is not a party to this appeal.

[AHP], or to ensure its enforcement." Specifically, plaintiffs alleged the City did not tell them that the AHP's "low income" restrictions applied to their units and that Bulmer sold the units to them at higher prices than the low income level. As a result, plaintiffs overpaid for their properties. Plaintiffs also requested private attorney general fees under Code of Civil Procedure section 1021.5.

The parties stipulated to the appointment of a temporary judge. The City moved for judgment on the pleadings based on the City's public entity immunity. The trial court denied the motion. Following a bench trial, the trial court issued its Statement of Decision. Stating that "equitable principles" controlled because of the declaratory relief cause of action, the court found, among other things, that "based upon the paramount importance of affordable housing programs," plaintiffs' units would retain their lower income designations. The court found, however, that its determination resulted in damages to plaintiffs, who had overpaid for their properties. The court ordered further proceedings to determine the amount of plaintiffs' damages.

In the damages phase of the trial, the court found both Bulmer and the City liable to plaintiffs for damages, explaining that, "while Bulmer is undoubtedly responsible for many of the errors, . . . [t]he City is also complicit . . . because it did not comply with some of the responsibilities imposed upon it under the provisions of its enabling ordinance, did not meet the contractual responsibilities imposed upon it under the Development Agreement with Bulmer, [and] failed to properly administer its own program or to provide appropriate safeguards which were required for the services which it delegated . . . ." Specifically, the trial court found that both the City and Bulmer allowed plaintiffs to purchase units even though their incomes exceeded the cap for low income units; they allowed plaintiffs' townhomes to be designated as low income units, but sold them for higher prices; and they permitted the execution of purchase agreements that did not identify the units as restricted.

The trial court found that the City "failed to provide any reasonable or appropriate safeguard to ensure that harm would not result" from the City's delegation of duties under the Development Agreement to Bulmer. The trial court concluded that "[i]f

4

the City is not held accountable for this, the purpose and policy behind affordable housing is thwarted. The City has not and cannot state how the mandated responsibility of providing affordable housing to the class of individuals for whom the project has been created is met when the sales are conducted in a manner which is violative of its own guidelines." The court calculated the Tuthills' total damages as $100,146 and Younker's as $145,850 and found that the City and Bulmer were jointly and severally liable.

*Private Attorney General Attorney Fees*

The court issued separate findings on the issue of attorneys' fees. The court set a lodestar rate of $325 per hour and awarded private attorney general fees of $330,720. The court entered separate judgments for the Tuthills and for Younker on January 20, 2012. This timely appeal followed.

DISCUSSION

*Public Entity Immunity*

"Except as otherwise provided by statute . . . [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." (§ 815, subd. (a).) Section 815 "abolished all common law or judicially declared forms of liability for public entities, except for such liability as may be required by the federal or state Constitution." (*Cochran v. Herzog Engraving Co.* (1984) 155 Cal.App.3d 405, 409.) Absent some constitutional requirement, "public entities may be liable *only* if a statute declares them to be liable." (*Ibid*.)

There are statutory exceptions to the immunity rule. At issue here is the "mandatory legal duty" exception found in section 815.6. Section 815.6 provides that: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

Before addressing the mandatory legal duty exception, we examine the trial court's decision that "equitable principles" governed its findings at trial.

5

*The Trial Court's Application of "Equitable Principles"*

As noted above, the City moved for judgment on the pleadings, asserting its immunity under section 815. The trial court denied the motion and proceeded to try the case by applying "equitable principles." The court "balanced the equities" between plaintiffs and the City in favor of the City by declining to remove the affordable housing designations from plaintiffs' units because doing so would offend the strong public policy favoring the provision of affordable housing. The court found, however, that plaintiffs were entitled to compensation based on the City's failure to protect plaintiffs, who were ineligible buyers, from purchasing AHP restricted properties. The trial court erred in substituting equitable principles for the analysis required by section 815.

Equitable doctrines "are designed to promote justice and to give effect to the lawful obligations of a party against whom complaint is made for refusing to perform some duty imposed upon him." (*Lass v. Eliassen* (1928) 94 Cal.App. 175, 179.) The trial court believed that the City's failure to notify purchasers of the restrictions on the purchase and sale of properties in the AHP called for such a remedy. Equity, however, may not be used to find liability where the result would nullify a contrary statute. "[A] court of equity will never lend its aid to accomplish by indirect means what the law or its clearly defined policy forbids to be done directly." (*Jackson and Thomas v. Torrence* (1890) 83 Cal. 521, 537.)

In *Timberline, Inc. v. Jaisinghani* (1997) 54 Cal.App.4th 1361, 1368, the plaintiff, a corporation, obtained a money judgment against the defendant. Before the judgment was paid, the Secretary of State suspended the plaintiff corporation for failure to pay franchise taxes. On the plaintiff's motion, the trial court renewed the judgment. The nonpaying defendant moved to vacate the renewal of the judgment based on the corporation's suspended status. Ultimately, the trial court renewed the judgment. The Court of Appeal reversed, explaining that Revenue & Taxation Code section 23301 deprives a suspended corporation of "the benefits of California laws and the assistance of the California judicial system." (*Timberline*, *supra*, at p. 1368.) The Court of Appeal expressly rebuffed the suspended corporation's resort to equity: "While we may

6

disapprove of [defendant's nonpayment of the judgment], we are not free to interject equitable doctrines into what is otherwise a comprehensive statutory scheme specifying the requirements and power of California corporations." (*Id.*, at fn. 5.)

The California Tort Claims Act likewise creates a comprehensive statutory scheme regarding governmental liability and immunity. (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Ca1.4th 992, 1001.) This scheme precludes a finding of liability against public entities without express statutory authorization. No statute permits a finding of liability based on "equitable principles." This case "is not one . . . for the application of equitable doctrines but rather one for the construction of an act of the legislature." (*Lass v. Eliassen*, *supra*, 94 Cal.App. at p. 179.) While we might agree with the trial court that the City's oversight of the AHP was inadequate, the court was not free to graft an equitable exception onto the Tort Claims Act.

We therefore turn to the "mandatory legal duty" exception to public entity immunity.

*The "Mandatory Legal Duty" Exception*

To qualify for the exception, a plaintiff must establish (1) the existence of an enactment that imposes a mandatory, not discretionary, duty on the public entity and (2) that the enactment is intended to protect against the particular kind of injury the plaintiff suffered. (*Haggis v. Superior Cour*t (2000) 22 Cal.4th 490, 498-499.) "Whether an enactment creates a mandatory duty is a question of law." (*Id*., at p. 499.)

*1. Enactment imposing a mandatory duty.*

Section 815.6 "requires that the enactment at issue be *obligatory*, rather than merely discretionary or permissive, in its direction to the public entity; it must require, rather than merely authorize or permit, that a particular action be taken or not taken. [Citation.]" (*Haggis v. Superior Court*, *supra*, 22 Cal.4th at p. 498.) Because the trial court based its damages award on "equitable principles," it did not inquire into the existence of a "mandatory legal duty imposed by an enactment." Plaintiffs suggest three possible sources of such a mandatory duty: Section 65580 et seq., the Amended AHP and the Development Agreement. None of those sources meets the statutory standards.

7

*a. Section 65580.*

Section 65580 "requires the cooperation of all levels of government" to provide affordable housing for low- and moderate-income households. Plaintiffs contend that section 65580 obligated the City "to enforce the [AHP], or to ensure its enforcement." As the trial court recognized, however, section 65580 constitutes a "general statement of public policy, not a directive to any agency . . . on how to implement that policy." (*Building Industry Assoc. v. Marin Mun. Water Dist.* (1991) 235 Cal.App.3d 1641, 1650.) A "general statement of public policy" cannot serve as the basis for a mandatory duty under section 815.6. (*In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 691-692; *Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 900, fn. 8.) Section 65580, therefore, imposed no mandatory duty on the City to protect plaintiffs, who were ineligible to purchase designated affordable housing, from purchasing restricted properties.

Plaintiffs' brief suggests, without analysis, that section 65580 *impliedly* mandates the City to manage its AHP in such a manner that plaintiffs would not be harmed. The law instructs otherwise: "To construe a statute as imposing a mandatory duty on a public entity, 'the mandatory nature of the duty must be phrased in explicit and forceful language.' [Citation.]" (*In re Groundwater Cases*, *supra*, 154 Cal.App.4th at p. 689.) The Supreme Court has rejected attempts by plaintiffs to find a mandatory duty based on an "implied duty" read into a statute. (*See Guzman v. County of Monterey*, *supra*, 46 Cal.4th at pp. 902-911 [finding no liability under the Safe Drinking Water Act based on an implied duty to notify customers, where the only directive imposed by the statute was a duty to review a water system's monitoring reports].) Section 65580 only directs public entities to cooperate in the provision of affordable housing and to address regional housing needs. It does not impose on the City a mandatory duty to protect ineligible buyers from buying restricted properties, and such a duty cannot be reasonably inferred.

*b. The Amended AHP.*

The Amended AHP requires the City to "[s]et and periodically update the requirements and qualifications for eligible households" and to "[r]eview records submitted by developer and applicant households to identify eligible households."

Plaintiffs contend that these directives create a mandatory legal duty that abrogates public entity immunity. Neither of these requirements, however, imposes an affirmative obligation to prevent sales to ineligible households, to notify the developer or the potential purchaser about his or her eligibility status, or to take any other actions beyond those explicitly stated.

The duty to set and periodically update requirements and qualifications is akin to the requirement that the state reassess "the risks and needs" of a parolee within a set period after his release from prison, which did not trigger any specific requirement of administrative action. (*Brenneman v. State of California* (1989) 208 Cal.App.3d 812, 817-818.) Likewise, a duty to review records to identify eligible households is equivalent to the duty to "investigate," which "may not reasonably be read as imposing a mandatory duty" to *take action.* (*State of California v. Superior Court* (1984) 150 Cal.App.3d 848, 858; s*ee also MacDonald v. State of California* (1991) 230 Cal.App.3d 319, 331 ["[a] mandatory duty to investigate [under Health & Saf. Code, § 1597.55] is not the same as a mandatory duty to take action"].) In the absence of a specific and explicit mandate requiring the City to take some affirmative action upon its "[r]eview [of] records submitted by developer and applicant households to identify eligible households," there is no mandatory duty to take any further or preventative actions. Accordingly, the Amended AHP cannot form the predicate mandatory duty for liability under section 815.6.

*c. The Development Agreement.*

Plaintiffs also cite the Development Agreement as a source of "a mandatory duty imposed by an enactment." This contention is meritless for two reasons. First, the term "enactment" refers to "a constitutional provision, statute, charter provision, ordinance or regulation." (§ 810.6.) The Development Agreement is a contract between the City and Bulmer. A "contract cannot give rise to 'a mandatory duty imposed by an enactment.'" (*Lawson v. Superior Court* (2010) 180 Cal.App.4th 1372, 1395, fn. 22.) Recognizing this, plaintiffs argue that Ordinance No. 92-17, by which the City authorized the Development Agreement, "elevates" that contractual agreement "to the status of an 'enactment'" for purposes of section 815.6. Plaintiffs cite no authority for this proposition and we reject it.

9

Nothing in Ordinance No. 92-17 imposes any obligation on the City; it simply authorizes the City Manager to execute the Development Agreement. Any obligations imposed by the Development Agreement are contractual duties, regardless of whether the City approved that obligation by ordinance. As the City observes, finding "a mandatory duty imposed by an enactment" in the City's contractual obligations – even a contractual obligation incorporated by reference into an ordinance – would have the absurd result of making a public entity liable in tort for its contractual obligations. Because the Development Agreement is not "a constitutional provision, statute, charter provision, ordinance or regulation," it does not amount to an "enactment" that gives rise to a mandatory duty under section 815.6.

Second, even if we were to consider the Development Agreement an "enactment" by virtue of its adoption by ordinance, it does not establish a mandatory duty on the part of the City to protect ineligible buyers from purchasing AHP restricted properties. Neither of the provisions of the Development Agreement on which plaintiffs rely, sections 5.5 and 15, creates such an obligation.

Section 5.5 of the Development Agreement states that the City will review and approve the developer's marketing program. Section 15 provides that the City will review the Development Agreement at least once a year, and that the developer will demonstrate its good faith compliance with the Development Agreement. To the extent these provisions impose obligations on the City, as opposed to Bulmer, they do not mandate affirmative action by the City. They only require review of documents. As explained more fully above, a duty to review does not encompass the broader duty to take action based on the review. (*MacDonald v. State of California*, *supra*, 230 Cal.App.3d at p. 331.)

2. *Protection Against the Kind of Injury Suffered by Plaintiffs*

Section 815.6 also requires that "the mandatory duty be 'designed' to protect against the particular kind of injury the plaintiff suffered." (*Haggis v. Superior Court*, *supra*, 22 Cal.4th at p. 499.) The injury must be "'one of the consequences which the [enacting body] sought to prevent through imposing the alleged mandatory duty.'" (*Ibid.*)

10

"That the enactment 'confers some benefit' on the class to which plaintiff belongs is not enough; if the benefit is 'incidental' to the enactment's protective purpose, the enactment cannot serve as a predicate for liability under section 815.6. [Citation.]" *(Ibid.)* In *Haggis*, the enactment held to constitute a mandatory duty was a municipal code section that required, among other things, that when a property was found unstable because of landslide, subsidence, or inundation, the defendant public entity was obligated to file with the County Recorder a certificate of substandard condition. (*Id.*, at p. 501.) The subject property was found to be unstable but the public entity failed to file such a certificate. A subsequent purchaser suffered damage to the property arising out of the unstable condition and sued the public entity for failure to file the certificate. The plaintiff alleged he would not have bought the property had the certificate been filed as required. (*Id.*, at p. 502.)

The plaintiff in *Haggis* contended that the purpose of the recordation requirement was to put future purchasers on notice of the instability. (*Haggis v. Superior Court*, *supra*, 22 Cal.4th at pp. 502-503.) The Supreme Court disagreed, explaining that, while the recordation requirement may have warned potential purchasers of the property's unstable condition, "that effect is aptly described as 'incidental' . . . to the ordinance's enforcement goal." (*Ibid.*) In other words, because the enactment was not designed to protect future purchasers from economic loss, the plaintiff in *Haggis* was unable to circumvent section 815.

Plaintiffs fail to demonstrate that any of the provisions they rely on – section 65580 et seq., the Amended AHP, or the Development Agreement, was intended to protect ineligible purchasers from economic losses. The intended beneficiaries of all these provisions are "low and moderate income households" who seek to benefit from the AHP. At best, plaintiffs were "incidental" beneficiaries of the enforcement goals of section 65580, the amended AHP and the Development Agreement.

*Duty to Warn*

Plaintiffs contend that the "duty to warn" required the City to advise them that the properties they sought to purchase were subject to AHP restrictions, in reliance on *Johnson v. State of California* (1968) 69 Cal.2d 782, and *Tarasoff v. Regents of the*

11

*University of California* (1976) 17 Cal.3d 425. The contention is meritless because both *Johnson* and *Tarasoff* address a public entity's vicarious liability for the negligence of its employees under section 820.2. Neither addresses section 815 or the mandatory legal duty exception of section 815.6, which are controlling here. Plaintiffs did not base their claims on the City's vicarious liability for the negligent conduct of its employees; their claims are based on the theory that the City itself was subject to a mandatory duty. As explained above, plaintiffs do not identify any mandatory legal duty that the City violated by failing to warn them that the properties they sought to purchase were subject to AHP restrictions.

*Private Attorney General Fees*

The trial court ordered the City to pay plaintiffs' attorneys' fees pursuant to the private attorney general statute, Code of Civil Procedure section 1021.5. Private attorney general fees are available to "a successful party" in an action that has resulted in the enforcement of an important right affecting the public interest if certain conditions are met. The trial court's attorneys' fees award must be vacated because plaintiffs are not successful parties. "The term 'successful party,' as ordinarily understood, means the party to litigation that achieves its objectives." (*Graham v. Daimler-Chrysler Corporation* (2004) 34 Cal.4th 553, 571.) The City prevailed on the issue of declaratory relief at trial in that the trial court found that plaintiffs' units would retain their lower income designations. Because we are reversing the trial court's damage award, the City prevails on that issue as well.

Although a favorable final judgment is not a prerequisite for "successful party" designation under section 1021.5 (*Schmier v. Supreme Court* (2002) 96 Cal.App.4th 873, 877), the plaintiff's action must at least have been a "'catalyst motivating defendants to provide the primary relief sought.'" (*Id.*, at p. 878.) This requires us to "'focus on the condition that the fee claimant sought to change.'" (*Ibid.*, citing *Crawford v. Board of Education* (1988) 200 Cal.App.3d 1397, 1407).

Plaintiffs' action sought to impose on the City the obligation to disclose to potential buyers that the units they sought to purchase were subject to "low income" restrictions on purchase and resale prices. As we have explained, their lawsuit did not

realize that objective.  The City has not modified or agreed to modify the AHP.  Nor has plaintiffs' action resulted in new law that affects the rights of persons the AHP was intended to benefit – low- and moderate-income households.  (*See Leiserson v. City of San Diego* (1988) 202 Cal.App.3d 725 [plaintiff entitled to private attorney general fees because his action defined the rights of the media under Pen. Code, § 409.5 even though he did not prevail on his tort theories].)  Because plaintiffs' action neither obtained the relief they sought nor vindicated an important right, they are not entitled to attorneys' fees based on the private attorney general doctrine.

DISPOSITION

The judgments for damages and the award of private attorney general fees are reversed.  Costs on appeal are awarded to the City.

CERTIFIED FOR PUBLICATION.

O'DONNELL, J.[*]

We concur:

GILBERT, P. J.

YEGAN, J.

---

[*] (Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to art. 6, § 6 of the Cal. Const.).

Rebecca S. Riley, Judge

Steven J. Stone, Judge[*]

Superior Court County of Ventura

_____

Andrew J. Wolf for Plaintiffs and Appellants Tuthill and Plaintiff and Respondent Younker.

Anderson Kill Wood & Bender, David P. Bender, Eric R. Reed, Caroline Hurtado Ford and Michael J. Stoner for Defendants and Appellants.

_____

[*]Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to Article I, section 6 of the California Constitution.