[No. A050084. First Dist., Div. Two. Dec. 10, 1992.]

VERNON SHAWN JORDY, Plaintiff and Appellant, v.
COUNTY OF HUMBOLDT, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.

738

COUNSEL

Halkides & Morgan, Arthur L. Morgan, Joyce D. Hinrichs and Daniel U. Smith for Plaintiff and Appellant.

Mitchell, Dedekam & Angell and Walter J. Carter for Defendant and Appellant.

Lloyd M. Harmon, Jr., County Counsel, and Deborah Peterson-Lee, Deputy County Counsel, as Amici Curiae on behalf of Defendant and Appellant.

OPINION

BENSON, J.—Vernon Shawn Jordy (Jordy) was placed in foster care by officials employed by respondent Humboldt County (County).[1] While in the care of the foster family, he was injured. He sued the County and won a large judgment. He appeals from an order granting the County a new trial. The County appeals from the judgment, from the order granting a new trial, and from an order denying its motion for judgment notwithstanding the verdict. The principal issue is whether the jury was properly instructed that the County was under a nondelegable duty to guard the minor from injury while he was in the care of the foster family. We find there was no nondelegable duty, and accordingly approve the trial court's determination its instruction on the point was error. We affirm the order granting a new

---

[1]We granted leave to San Diego County to file a brief as amicus curiae. We have also received letters from several other California counties setting out various legal arguments similar to those made by San Diego County. We have considered San Diego County's brief. We disregard the letters submitted by other nonparties to this action, as they are not properly before us.

trial and denying the motion for judgment notwithstanding the verdict. We dismiss the County's appeal from the judgment as moot.

## I.

### *Facts*

There is no substantial dispute over the facts; in view of our disposition of the case, we limit our summary to those relevant to our discussion.[2] In February 1986, Jordy was 16 years old, a ward of the court in the custody of his parents, and on juvenile probation for a petty theft offense. During a meeting with his probation officer, Vicki Foster (Foster), he told her he had been beaten by his father. Foster spoke with Jordy about possible placement in a foster home and referred the matter to the County's child protective services unit. Foster also checked with Jordy's therapist, who told her he had heard similar reports of abuse from Jordy. A few days later, Foster again heard from the therapist, who told her Jordy had told him of continued and daily abuse, which was confirmed by the therapist's observation of bruises on Jordy's body. On the following day, Foster visited Jordy at school in the company of respondent Beverly Lewis (Lewis), a child protective services worker. Again, Jordy reported continued physical and psychological abuse by his father. Based on the information available to her, Lewis determined Jordy should be removed from his home and put into protective custody. Accordingly, Foster and Lewis took Jordy to the County Sheriff's office, where he was interviewed by a deputy and placed in protective custody. Following state administrative regulations and County policies, Jordy was temporarily placed with the Whitehead family, which was licensed by the State of California to operate a foster home. Lewis took Jordy to the Whitehead home on a Friday evening, and told him he would be there at least over the weekend.

The Whitehead family consisted of Frances Whitehead, her husband, her son, and her two grandchildren. The Whiteheads had a three-wheeled all-terrain vehicle (ATV), which they kept in a garage separate from their house. That weekend, the day after he had been placed with the Whiteheads, Jordy asked if he could ride the ATV. He told the Whiteheads he had a driver's license, and that he had ridden ATV's before. In fact, he had no license, and had never ridden an ATV before. The Whiteheads told him he was not to ride the ATV on pavement. On Saturday, Jordy rode the ATV off the road on nearby trails with Tony Whitehead, who was then 16 years old. On Sunday, Jordy got permission from Frances Whitehead to use the ATV. He went with

---

[2]The bulk of the omitted material is evidence offered to prove the independent negligence of the County.

Tony Whitehead to a gravel road which led from the garage, across some railroad tracks, and via a gate, to a paved road. Despite instructions not to use the ATV on pavement and a warning not to go past the gate, when Jordy got on the ATV, he drove to the gate, around it, and onto the paved road. Jordy testified he had decided to drive the ATV home to his parents' house. Shortly after he reached the pavement, he lost control of the ATV as he attempted to make a right turn. He hit a parked car, and was thrown off the ATV. As a result of the accident, he sustained severe and permanent injuries to his left leg. At trial, there was expert testimony that three-wheel ATV's are dangerous on pavement and require considerable training to operate safely.

Jordy, by his guardian ad litem, filed suit against the county, the Whiteheads, and Lewis. The Whiteheads settled in good faith, and the case went to trial against Lewis and the County.[3] At Jordy's request, the jury was instructed that the County had a nondelegable duty to provide the equivalent of parental care and guidance to Jordy. Based on that instruction, counsel for Jordy argued to the jury that if it found the Whiteheads negligent, it must find the County liable for a breach of its nondelegable duty. In its responses to the questions submitted to it on special verdict forms, the jury found Frances Whitehead was negligent, and that the County was liable for that negligence because its duty to Jordy was nondelegable. The jury awarded damages of slightly more than $1 million, reduced 25 percent for Jordy's comparative negligence. On March 2, 1990, judgment was entered accordingly, and on March 8, 1990, notice of entry was served. The County moved for new trial and judgment notwithstanding the verdict, contending among other things that the jury instruction on nondelegable duty was erroneous and prejudicial. Because the County requested new trial on less than all the issues, Jordy made a protective motion requesting full new trial if the County's motion were granted. On May 4, 1990, the court filed its written order granting both motions. The order stated no reasons, but recited that a "formal opinion" would be forthcoming. On May 9, 1990, 62 days after service of notice of entry of judgment, the court filed its statement of reasons in support of the order. It recited the reasons for the order were (1) error in giving the nondelegable duty instruction, and (2) excessive damages. Both Jordy and the County appeal from the order, and the County appeals from the judgment and an order denying its motion for judgment notwithstanding the verdict.

---

[3]Though Lewis is named in the judgment, the special verdict forms submitted to the jury did not mention her, and there is no record of any verdict either for or against her. Because we affirm the order granting new trial, the judgment is a nullity. However, for the guidance of the parties and court on remand, any future judgment entered in this action should be supported by an appropriate verdict or findings.

## II.

### Scope of Review

■ We first dispose of Jordy's contention we may not affirm the new trial order on the stated ground the nondelegable duty instruction was error. Jordy argues that because the court's statement of reasons was invalid, we may not affirm on any of the grounds it recited. It is true the statement of reasons was a nullity because filed more than 60 days after notice of entry of judgment. (Code Civ. Proc., §§ 657, 660; see, e.g., *Sanchez-Corea* v. *Bank of America* (1985) 38 Cal.3d 892, 903-904 [215 Cal.Rptr. 679, 701 P.2d 826].) However, it does not follow that we may not consider any of those grounds which happen to have been recited in an untimely statement of reasons. To the contrary, we are only prevented from affirming on grounds of insufficiency of the evidence or excessive damages; we may affirm on any other ground advanced in the motion for new trial, whether or not it was mentioned in the defective statement of reasons. (*Id.* at p. 905; see *Byers* v. *Board of Supervisors* (1968) 262 Cal.App.2d 148, 152-153 [68 Cal.Rptr. 549].) The County supported its motion for new trial with a claim the nondelegable duty instruction was erroneous. We turn to a discussion of that issue.[4]

## III.

### Nondelegable Duty

■ As we have noted, the court instructed the jury the County's duty of care to Jordy was not delegable.[5] On the motion for new trial, the court concluded it had erred. We agree. As we discuss in greater detail below, we conclude a public agency charged with the care of children removed from the care of their parents may delegate that responsibility to other individuals, whether relatives or independent contractors, without fear it will be liable for injury proximately caused by occasional negligence in the day-to-day supervision of the children. We find standard tort principles do not require us to

---

[4]Perhaps from an excess of confidence in his assumption we could not legally reach the issue, Jordy failed to address the propriety of the nondelegable duty instruction in the opening brief. However, the issue is raised in the County's opening and responding brief, and is well argued in Jordy's reply. Because it would be of little service to the parties and court on remand if we deemed the issue waived by failure to argue, we determine the question.

[5]The jury was instructed as follows: "When the County removes a child from the custody of the child's parents, the County has a duty to provide care and guidance to the child equal to the care and guidance a normal and reasonable family would provide to a child. The County is not a insurer of the child's safety, but it does have the duty to attempt to provide normal care for a child placed in shelter care. The duty to provide such care as would be provided by the normal family cannot be delegated to others."

impose such liability, and that a contrary result would impose such a burden on the already difficult administration of juvenile law that any benefit to individual minors realized would be far outweighed by the damage to the greater number.

There are several theoretical bases on which a nondelegable duty may be rested; Jordy argues first there is a mandatory nondelegable legal duty on the County to provide nonnegligent care for children it has made wards, and second, that the injury to Jordy was the result of a special or peculiar risk which the County had a nondelegable duty to prevent. We treat each contention in turn.

## 1. *Mandatory Duty*

■ "[A] nondelegable duty operates, not as a substitute for liability based on negligence, but to assure that when a negligently caused harm occurs, the injured party will be compensated by the person whose activity caused the harm and who may therefore properly be held liable for the negligence of his agent, whether his agent was an employee or independent contractor." (*Maloney* v. *Rath* (1968) 69 Cal.2d 442, 446 [71 Cal.Rptr. 897, 445 P.2d 513, 40 A.L.R.3d 1]; and see *Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245, 250-252 [66 Cal.Rptr. 20, 437 P.2d 508] [discussing nondelegable duty].) A California public agency is subject to the imposition of the duty in the same manner as any private individual. (Gov. Code, § 815.4; *Van Arsdale* v. *Hollinger, supra*, 68 Cal.2d at p. 249.) " '. . . Where the law imposes a definite, affirmative duty upon one by reason of his relationship with others, whether as an owner or proprietor of land or chattels or in some other capacity, such persons can not escape liability for a failure to perform the duty thus imposed by entrusting it to an independent contractor. . . . It is immaterial whether the duty thus regarded as 'nondelegable' be imposed by statute, charter or by common law. . . .' " (68 Cal.2d at p. 251, quoting Harper, Law of Torts (1933) § 292.) ■ Jordy argues Welfare and Institutions Code section 202 imposes a definite and affirmative duty on the County to provide the equivalent of parental care to minors who are taken from their homes and placed in foster care. We are not persuaded.

Welfare and Institutions Code section 202 provides in relevant part that when "the minor is removed from his or her own family, it is the purpose of [the juvenile court law] to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents." The statute goes on to require that minors made wards "shall receive care, treatment and guidance consistent with their best interest" and that of the public. (Welf. & Inst. Code, § 202, subds. (a) and (b).) Jordy

argues that by this language, the Legislature imposed a duty on juvenile authorities to provide the same standard of care for wards as is imposed on a parent. Applying the general rule that a duty imposed by law may not be delegated, he concludes the County had a nondelegable duty to use due care in its supervision of Jordy's day-to-day activities. However, it is far from clear the Legislature intended the conclusion Jordy reaches. (See *MacDonald v. State of California* (1991) 230 Cal.App.3d 319, 330 [281 Cal.Rptr. 317] [existence of mandatory duty depends on statutory language and legislative purpose].)

What California authority there is does not support Jordy's position. The statutory language in question can be traced to the Act of 1903 which established the juvenile court law. (Stats. 1903, ch. 43, pp. 44, 48.) In section 13 of that act, the Legislature stated the purpose of the act was that "the care, custody, and discipline of a child shall approximate as nearly as may be that which should be given by its parents." That language has been continued to the present Welfare and Institutions Code section 202 virtually without change, though the juvenile court law itself has swollen to proportions doubtless unimagined by the 1903 Legislature. (See Stats. 1909, ch. 133, § 27, p. 226; Stats. 1915, ch. 631, § 24, p. 1248; Stats. 1937, ch. 369, § 551, p. 1021.) As originally drafted, the purpose of the juvenile court law was not to preserve the minor from parental negligence, but to "supplant parental control, custody, and discipline which has been lacking, with the end in view that the child should not become a criminal in later years, but a useful member of society." (*People* v. *Renteria* (1943) 60 Cal.App.2d 463, 470 [141 P.2d 37].) That interpretation is borne out by the relatively narrow scope of the original juvenile court law, which was by its terms addressed only to the problem presented by unfit homes, juvenile vagrancy, delinquency, and crime. (See Stats. 1937, ch. 369, § 700, pp. 1030-1031.)

In its modern incarnation, the juvenile court law is of course much broader in scope than that enacted in 1903. In addition to its various provisions intended to address the problem of juvenile crime, it is intended to protect minors where they are subject to a substantial risk of physical or mental harm as the result of intentional or pervasively negligent conduct of their parents or guardians. (Welf. & Inst. Code, § 300; see, e.g., *In re James B.* (1985) 166 Cal.App.3d 934, 937 [212 Cal.Rptr. 778].) If the intent of the juvenile court law, in addition to its other purposes, were to protect against the occasional lapse of parental judgment which might result in death or injury to children, Jordy's claim the law imposes a mandatory duty would be better founded. However, it is clear the law was never intended to reach so far. Whatever the scope of the protection intended by the juvenile court law, it does not extend to every isolated lapse of parental judgment which a jury

may in retrospect find negligent. No one would suggest a child could be taken from its parent where the parent, in an isolated lapse, failed to prevent the child from darting into the street, or failed to provide adequate training in the use of roller skates, or left a ladder leaning in a place where the child might find it. (See Welf. & Inst. Code, § 300, subd. (j) [purpose of law not to "intrude inappropriately into family life" or to "prescribe a particular method of parenting"].) Yet in each of these examples, a child could potentially sustain injury matching or exceeding that which Jordy suffered here, and a jury could potentially find the injury was the result of parental neglect. The juvenile court law was not intended to prevent such relatively isolated instances of parental neglect; if it were, there is hardly a family in the state which would not be within its reach. Because the juvenile court law is not a guarantee that no child will ever be the victim of its parent's occasional and casual neglect, we decline to find the Legislature's statement of purpose in Welfare and Institutions Code section 202 imposes a "definite affirmative duty" on the County to prevent all forms of parental neglect by foster families with whom wards of the court may be placed. (*Van Arsdale* v. *Hollinger, supra,* 68 Cal.2d at p. 249.)

 For similar reasons, we reject Jordy's claim we should impose a duty on the County based on fiduciary obligation. Relying upon *Barry* v. *Raskov* (1991) 232 Cal.App.3d 447, 453-454 [283 Cal.Rptr. 463], Jordy claims we should approve the nondelegable duty instruction because the County owed Jordy a fiduciary duty and had the opportunity to observe the Whitehead's performance and to influence their conduct. In *Barry,* the court found a mortgage broker could not evade his fiduciary responsibility to his client by employing an independent contractor to perform appraisals; the broker was liable when the appraisers performed negligently. (*Id.* at pp. 452, 456.) The court reasoned fiduciaries should not be allowed to "evade their responsibilities by simply allocating them among numerous unlicensed independent contractors." (*Id.* at p. 455.) We reject this argument for the same reasons we decline to find a mandatory duty on the County in the Welfare and Institutions Code. At bottom, *Barry* relies on the legal duty imposed on a fiduciary, both at common law, and in the case of mortgage brokers, by the Business and Professions Code. (*Id.* at pp. 455-456.) As we have discussed, there is no duty imposed by law on the County to prevent isolated instances of ordinary parental neglect; even assuming the dubious proposition that the Legislature's grant to public entities of discretionary power to interfere in family relations creates any duty to prevent injury to wards placed in the care of foster families (or with their own families, for that matter), it would certainly be limited to those specific evils the juvenile court law was enacted to prevent, i.e., intentional abuse and systematic neglect. (Cf. *MacDonald* v. *State of California, supra,* 230 Cal.App.3d at pp. 328-329 [where statutes

provide for agency discretion, no duty created].) Moreover, we are not prepared to find that the discretionary decision finding a minor within the jurisdiction of the juvenile court is equivalent to the contractual creation of a fiduciary relation between broker and client. We therefore reject Jordy's arguments based on *Barry*.

Finally, Jordy claims we should find a mandatory duty based on the importance of the County's obligation to care for children taken from their parents. Jordy relies on various juvenile cases which speak in general terms of the interests of the state in the welfare of children and of the importance of protecting the child's best interests. (See, e.g., *In re Angelia P.* (1981) 28 Cal.3d 908, 917 [171 Cal.Rptr. 637, 623 P.2d 198] [discussing level of proof required to terminate parental rights under Civ. Code, § 232].) Again, Jordy's argument is a version of his claim the law imposes a nondelegable duty to prevent negligence by foster families; here, he argues we should impose such a duty as a matter of public policy. (See *Van Arsdale* v. *Hollinger, supra*, 68 Cal.2d at p. 253 [stating general rationale for imposition of nondelegable duty].) We decline to do so. It is true the state has a significant interest in the welfare of children in general, as shown by the provisions of the Welfare and Institutions Code. It is also true the state's interest is of great public importance. However, as we have discussed, the interest is in the prevention of egregious parental abuse and neglect, not in interposing the state between parent and child in every aspect of the day-to-day tasks of child care. Jordy cites no authority supporting a contrary position. *Vonner* v. *State Department of Public Welfare* (La. 1973) 273 So.2d 252, 253, on which Jordy relies, is factually inapposite. In *Vonner*, the court found a nondelegable duty existed which the state could not avoid by placing a ward with a foster family. (*Id.* at p. 256.) However, in *Vonner*, the children in question had been severely beaten by the foster parents; in fact, the event which triggered the suit was the death of one of the children at the hands of the foster parents. (*Id.* at p. 253.) In addition, the children had complained of the beatings to social workers, but had been disbelieved, and the public entity had failed to conduct required regular inspections of the home. (*Id.* at p. 254.) The court found a duty on the state based on the Louisiana custody statute, which defined "custody" to include "*responsibility* to provide for the physical . . . well-being of the child." (*Id.* at p. 256, internal quotation marks omitted.) Based on that statute, *Vonner* found the duty of the state was to ensure the children were "adequately fed, clothed, and protected from intentional physical abuse causing serious injury," and that the county could not delegate its duty to prevent "physical abuse of the child." (*Ibid.*) We find *Vonner* stands for the proposition that a public entity has a duty to prevent physical abuse of children in the custody of the state where it has notice of the abuse, which is not the case here. If, as Jordy urges, *Vonner* is read as

imposing unlimited liability on public entities for all negligently caused injuries to children placed in foster care, we decline to follow it. We find no sound reason to impose such a duty, and several good reasons not to. A rule imposing strict liability on counties for every injury which could be traced to isolated instances of negligent supervision on the part of foster parents could easily discourage counties from placing children in foster care, with resulting harm to children who might otherwise benefit from such care. In addition, as shown by this case,[6] the rule would in effect make the county the insurer of its contract foster families. If that result is to be accomplished, we think it more appropriately done by the Legislature, which has required the County to place abused children in appropriate shelters. (See Welf. & Inst. Code, § 300, subd. (j) [stating purposes of law].)

## 2. Peculiar Risk

In the alternative, Jordy claims we should impose a nondelegable duty on the County because the risk that Jordy would attempt to flee from the Whiteheads' home was a foreseeable danger inherent in the placement of wards with foster families against which the County should have taken special precautions. The legal basis of Jordy's claim is established. "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise." (Rest.2d Torts, § 416; see, e.g., *Van Arsdale v. Hollinger, supra,* 68 Cal.2d at p. 254; see generally, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1992) § 2.69, pp. 143-144.) " 'A peculiar risk is a risk which is peculiar to the work to be done and arises out of its character or the place where it is to be done, and against which a reasonable person would recognize the necessity of taking special precautions.' [Citations.] It is something other than the ordinary and customary dangers which may arise n the course of the work or of normal human activity. ' "Peculiar" does not mean that the risk must be one which is abnormal to the type of work done, or that it must be an abnormally great risk. It has reference only to a special, recognizable danger arising out of the work itself.' [Citation.]." (*Aceves v. Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 509 [156 Cal.Rptr. 41, 595 P.2d 619].) Whether the peculiar risk doctrine should apply in a given case is ordinarily resolved by the trier of fact in response to two questions: (1) whether the work was likely to create a special risk of harm in the absence of special precautions,

---

[6]We are informed the Whiteheads settled the action by assigning their rights to sue their own insurer to Jordy, an indication their insurance coverage was at least disputed.

and (2) whether the employer did or should have recognized such a risk. (*Jimenez* v. *Pacific Western Construction Co.* (1986) 185 Cal.App.3d 102, 110 [229 Cal.Rptr. 575].) Here, the jury was instructed that the County had a nondelegable duty. So far as the instruction depended on the application of the peculiar risk doctrine, the instruction was proper only if the trial court could have found the doctrine applied as a matter of law. (*Ibid.*) ▪ Thus, in our review of the question, we consider whether the peculiar risk doctrine applied as a matter of law.

Jordy argues the peculiar risk here was the risk that Jordy would flee from the Whiteheads' residence. There may or may not have been such a risk. However, even assuming there was a risk Jordy would flee, it was not a risk of physical harm to Jordy or anyone else. The danger of flight, as such, posed no specific or contemplated special physical hazard against which any precaution might be taken. Under such circumstances, the peculiar risk doctrine has no application, because there is no direct link between the dangerous event or condition which results in injury and the argued risk. We conclude the peculiar risk doctrine could not support the instruction given. (*Addison* v. *Susanville Lumber, Inc.* (1975) 47 Cal.App.3d 394, 402-403 [120 Cal.Rptr. 737].) Jordy cites no authority supporting the proposition that a probable course of conduct is a peculiar risk absent some evidence linking that course of conduct with some specific and special harm against which the employer should guard. To the extent there is authority bearing on the point, it is to the contrary. (See, e.g., *A. Teichert & Son, Inc.* v. *Superior Court* (1986) 179 Cal.App.3d 657, 662 [225 Cal.Rptr. 10] [risk of road accident while driving dump truck not "peculiar" to activity of driving]; *Addison* v. *Susanville Lumber, Inc., supra,* 47 Cal.App.3d 394, 402-403 [general risk of using untrained employees was not "peculiar" because it created no special and recognizable physical risk of harm which could have been prevented by particular precautions].) We conclude the peculiar risk doctrine cannot support the nondelegable duty instruction given in this case. ▪ In view of that conclusion and our determination no mandatory duty existed by virtue of law or policy, we find the trial court was correct to grant a new trial based on error in jury instruction.[7]

IV.

*County's Appeal**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

[7]Because we affirm the order granting new trial based on the faulty nondelegable duty instruction, we do not reach Jordy's other arguments intended to defeat other possible bases for the order.

*See footnote, *ante,* page 735.

V.

*Disposition*

The order granting a new trial and denying judgment notwithstanding the verdict is affirmed. In view of that determination, the County's appeal from the judgment is dismissed. (*Sandco American, Inc.* v. *Notrica* (1990) 216 Cal.App.3d 1495, 1498 [265 Cal.Rptr. 587].) The parties are to bear their own costs.

Kline, P. J., and Phelan, J., concurred.