[No. B206959. Second Dist., Div. Two. Aug. 4, 2009.]

J.L., a Minor, etc., Plaintiff and Appellant, v.
CHILDREN'S INSTITUTE, INC., Defendant and Respondent.

### COUNSEL

Law Offices of Michels & Watkins, Jin N. Lew; Steven B. Stevens and Steven B. Stevens for Plaintiff and Appellant.

Kessel & Associates, Elizabeth M. Kessel and Scott E. Boyer for Defendant and Respondent.

### OPINION

**DOI TODD, J.**—Plaintiff and appellant J.L., a minor, by and through his guardian ad litem D.L., appeals from a judgment entered in favor of defendant and respondent the Children's Institute, Inc. (CII), following a grant of summary judgment on appellant's complaint for negligence. Appellant was sexually assaulted by a 14 year old while in a family daycare home to which CII referred him. The trial court ruled that CII owed no duty to protect appellant from the harm suffered. We affirm. CII owed no duty to protect against an unforeseeable criminal assault, nor was it vicariously liable for any possible breach of duty by the daycare provider.

## FACTUAL AND PROCEDURAL BACKGROUND

*CII and Its Referral of Appellant to Yglesias.*

CII is a nonprofit corporation that provides licensed family childcare services to eligible families. It has a master contract with the State of California to provide childcare services through its own licensed daycare facilities located in four areas in Los Angeles County. It also contracts with approximately 45 licensed family daycare homes to which eligible families may be referred. Each family daycare home with which CII contracts must be licensed by the State Department of Social Services, Community Care Licensing Division (CCL); CII does not license childcare providers. Rather, CII enters into annual contracts with each family daycare home to which it makes referrals.

A family seeking to receive CII services must submit an application. Eligibility may be based on one of four categories: level of income, a request from child protective services, homelessness or the child's disability. If deemed eligible, CII can refer the family for childcare services at its primary facility or it can refer the family to a family daycare home. If the family elects the latter, CII provides the names of at least three contracted family daycare homes. The family can then visit those homes and select one. If a child is receiving daycare services at a location other than CII's primary facility, the day-to-day supervision of the child is the responsibility of the family daycare home.

In 1997, CCL licensed Yolanda Yglesias to provide home daycare for up to six children, ages zero to four. CII provided Yglesias with the training and education that enabled her to apply for a license. Beginning in August 1997, Yglesias received regular annual contracts to provide childcare services in her home and had received referrals from CII since that time. The pertinent contracts dated July 1, 2004, and July 1, 2005, each captioned "Independent Contractor Agreement," outlined the obligation of the childcare provider to provide quality childcare services for children referred by CII, in exchange for the chilccare provider being remunerated in accordance with an attached schedule. The contracts further stated that the childcare provider was not to be considered an agent or employee of CII and that neither party was to make any representations tending to create an apparent agency relationship. Though the contracts did not limit Yglesias to providing daycare only to CII referrals, all children in her care were referred by CII.

In February 2004, CII's Martha Ramirez became the case manager responsible for the Yglesias family daycare home. As the case manager, she would visit the home twice monthly—once to collect timesheets and once to check on the children to make sure there were no obvious problems. Before August 2004, Ramirez had referred one or two children to Yglesias. During the period between August 2004 and August 2005, Ramirez's file indicated that no problems with Yglesias's home had been reported or observed.

Single mother D.L. first contacted CII on August 9, 2004, seeking childcare for appellant, her son. Ramirez met with D.L., appellant and appellant's sister on August 12, 2004, as the family's case manager, and she determined that the family's income level rendered them eligible for services. Ramirez provided D.L. with three referrals, and D.L. ultimately chose the Yglesias home. Appellant began receiving childcare services at the Yglesias home on August 16, 2004. Between August 2004 and August 2005, Ramirez referred two other families to the Yglesias home without incident.

Sometime in 2005, D.L. saw two adult male individuals at the Yglesias home whom Yglesias identified as her grandchildren. When D.L. expressed

her concern to Ramirez about whether those individuals were authorized to be at the daycare facility, Ramirez indicated that Yglesias had assured her the individuals remained outside doing mechanical work. Ramirez added that individuals needed to be authorized to be present at the Yglesias home. Approximately one month later, D.L. first saw 14-year-old E.Y. inside the daycare area, playing with things. Yglesias explained that E.Y. was her grandson visiting her while on vacation. D.L. expressed her concern to Ramirez about E.Y.'s presence at the childcare facility. About the same time, Ramirez personally observed E.Y. at the Yglesias home. In response to Ramirez's inquiry, Yglesias again stated that E.Y. was her grandson who was on vacation. Ramirez observed that E.Y. was present at some but not all of her subsequent visits to the Yglesias home; she never saw him near any of the children, as he was always in the garage or the backyard. Ramirez was neither suspicious of nor concerned by E.Y.'s presence, as she never observed or received a report about a lack of supervision by Yglesias or any inappropriate behavior by E.Y. Moreover, Ramirez never received any information indicating that E.Y. had a history of sexual abuse as either a perpetrator or a victim. Appellant referred to E.Y. as his friend.

On August 16, 2005, E.Y. raped and sodomized appellant. At that point, Yglesias surrendered her daycare license and closed the facility.

*The Pleadings and Summary Judgment.*

In March 2006, appellant filed a complaint against CII and Yglesias seeking damages for negligence. He alleged that "[o]n or about August 16, 2005, while in the care, custody and/or control of defendants, the minor plaintiff [J.L.] was battered, assaulted, raped and/or sodomized by [E.Y.], a male relative of defendant Yolanda Yglesias, who was permitted to enter and remain on the childcare facility which Plaintiff attended." He alleged that defendants "owed a duty to Plaintiff to carefully, adequately, and properly supervise the children at their childcare facility, including Plaintiff herein. Defendants and each of them breached said duty by failing to properly, adequately and carefully supervise the children, and failing to control, monitor, inspect, maintain, repair and/or safeguard their premises from conditions that posed unreasonable dangers facilitating and/or encouraging acts of abuse." According to the complaint, defendants knew or should have known that such incidents could occur on the premises and should have taken precautionary measures. He added that defendants knew or had reason to know that E.Y. was dangerous and failed to protect and/or warn appellant and his mother of such danger. The complaint further alleged that defendants violated state laws intended to protect minors such as appellant. Finally, the complaint alleged that "each of the defendants . . . was the agent and/or employee of each of their codefendants and in doing the things herein alleged were acting within the purpose and scope of said agency and employment."

CII answered in June 2006, generally denying the allegations and asserting multiple affirmative defenses.[1]

In January 2007, CII moved for summary judgment on the grounds the undisputed evidence showed it was not vicariously liable for the acts of independent contractor Yglesias and it was not itself negligent in its referral to and supervision of Yglesias, and in its failure to warn appellant and his family of an unforeseeable risk.

Appellant opposed the motion in July 2007. He argued that triable issues of fact existed as to CII's liability under theories not addressed in the motion, including nondelegable duty, ratification, the special relationship between CII and appellant, and CII's breach of statutory duties of care. He also argued that CII had failed to meet its burden to show there were no triable issues of fact concerning the theories CII addressed, including negligent referral and negligent supervision, inspection and monitoring. In support of his opposition, he submitted declarations, deposition excerpts and documents produced by CII; he also sought judicial notice of various statutes, rules and regulations. In one declaration, child welfare consultant Mary Ann Xavier opined that CII was negligent in not inquiring further about E.Y.'s presence at the Yglesias home. Appellant also filed evidentiary objections to CII's evidence in support of the motion.

CII's reply focused on the absence of evidence supporting an element of appellant's case, asserting there was no evidence demonstrating it was reasonably foreseeable that E.Y. would sexually assault appellant. It, too, filed evidentiary objections to appellant's evidence.

After the trial court granted two requests from appellant to continue the summary judgment motion, it heard the motion on August 20, 2007. Although its tentative ruling was to deny the motion, it permitted CII and appellant additional time to provide briefing on appellant's new theory that CII owed appellant a nondelegable duty. After receiving the additional briefing, the trial court recalled the matter on September 17, 2007, and granted the motion for summary judgment. It determined that the principles enunciated in *Jordy v. County of Humboldt* (1992) 11 Cal.App.4th 735 [14 Cal.Rptr.2d 553] applied and concluded that CII owed no duty to prevent the type of harm suffered by appellant. Judgment was entered in January 2008.

Thereafter, appellant moved for a new trial on the grounds that the motion failed to address all theories of liability he raised in his complaint, including

---

[1] The record does not reflect whether Yglesias answered, nor does it indicate whether the action remains pending against her below.

ostensible agency. In support of the motion, he submitted a new declaration from D.L. in which she stated that she believed CII was responsible for supervising appellant. CII opposed the motion, asserting that appellant had failed to articulate any basis warranting relief under Code of Civil Procedure section 657. It also moved to strike any new declarations filed in support of the motion. Following a March 27, 2008 hearing, the trial court denied the motion for new trial and denied CII's motion to strike the declarations filed by appellant.

In April 2008, appellant appealed from the judgment.

## DISCUSSION

Appellant contends that the trial court erred in granting summary judgment because the motion failed to address all theories of liability raised in the complaint. Specifically, appellant contends that triable issues of fact remain as to whether CII may be directly liable because it had a special relationship with appellant and whether it may be vicariously liable under the theories of nondelegable duty and ostensible agency. The parties and the trial court addressed these theories below. We find no basis to disturb the trial court's conclusion that CII was entitled to judgment as a matter of law on appellant's negligence cause of action.

### I. Standard of Review.

We review a grant of summary judgment de novo. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517] (*Southcoast Childcare*); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843–857 [107 Cal.Rptr.2d 841, 24 P.3d 493].) The general rule is that summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ." (Code Civ. Proc., § 437c, subd. (c).) We consider " 'all of the evidence set forth in the [supporting and opposition] papers, except that to which objections have been made and sustained by the court, and all [uncontradicted] inferences reasonably deducible from the evidence.' " (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612 [76 Cal.Rptr.2d 479, 957 P.2d 1313].) "In independently reviewing a motion for summary judgment, we apply the same three-step analysis used by the superior court. We identify the issues framed by the pleadings, determine whether the moving party has negated the opponent's claims, and determine whether the opposition has demonstrated the existence of a triable, material factual issue." (*Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261 [76 Cal.Rptr.2d 382].) If there is no triable issue of material fact, "we affirm the summary judgment if it is correct on any legal

ground applicable to this case, whether that ground was the legal theory adopted by the trial court or not, and whether it was raised by defendant in the trial court or first addressed on appeal." (*Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1071 [56 Cal.Rptr.3d 312].)

## II. *CII Owed No Duty to Protect Against an Unforeseeable Criminal Assault.*

■ To prevail in a negligence action, a plaintiff must show that the defendant owed a legal duty, the defendant breached that duty and the breach proximately caused injury to the plaintiff. (*Southcoast Childcare, supra,* 32 Cal.4th at p. 1145; see also *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068, 1078 [107 Cal.Rptr.2d 801] [" 'To establish liability in negligence, it is a fundamental principle of tort law that there must be a *legal duty* owed to the person injured and a breach of that duty which is the proximate cause of the resulting injury.' "].) "Absent a legal duty, any injury is an injury without actionable wrong. [Citation.] 'Duty, being a question of law, is particularly amenable to resolution by summary judgment. [Citation.]' [Citation.]" (*Romero v. Superior Court, supra,* at p. 1078.) ■ As further explained in *Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 150 [42 Cal.Rptr.3d 519] (*Margaret W.*): "If there is no duty, there can be no liability, no matter how easily one may have been able to prevent injury to another. . . . [T]he existence of the duty in the first place is a question of law for the court. [Citation.] The existence and scope of any duty, in turn, depends on the foreseeability of the harm, which, in that context, is also a legal issue for the court. [Citation.]"

■ Appellant maintains that there was a "special relationship" between CII and appellant that established a duty as a matter of law. "The existence of a special relationship, however, is only the beginning of the analysis." (*Margaret W., supra,* 139 Cal.App.4th at p. 152.) Thus, even when a defendant has formed a special relationship with a plaintiff, courts uniformly hold that the defendant has no duty to protect the plaintiff from unforeseeable third party criminal conduct. (*Southcoast Childcare, supra,* 32 Cal.4th at p. 1150; *Margaret W., supra,* at pp. 152–153; *Romero v. Superior Court, supra,* 89 Cal.App.4th at pp. 1081–1083.)

For example, in *Margaret W., supra,* 139 Cal.App.4th 141, the 15-year-old plaintiff and one or two other girls were invited for a sleepover with the defendant's daughter. The defendant went out for the evening, instructing the girls that they could not have a party, could not invite boys over and could not drink alcohol. While the defendant was away, boys came over and the group began drinking. The plaintiff eventually voluntarily left with the boys. Later that evening when the defendant returned home at the urging of one of

the other girls, she tended to her daughter who had passed out from drinking too much. When the plaintiff telephoned the defendant that same evening, the defendant instructed one of the other girls to tell her she could not return and she should go home. The plaintiff did not indicate that she felt threatened by being with the boys or that she did not have any means of getting home. The plaintiff stayed overnight at the home of one of the boys, where she was sexually assaulted. (*Id.* at pp. 145–148.)

■ The Court of Appeal affirmed a grant of summary judgment in favor of the defendant on the plaintiff's negligence claims. Though acknowledging that the defendant assumed a special relationship with the minor plaintiff by inviting her into her home, the court relied on the broader principle that "[i]n order for there to be a duty to prevent third party criminal conduct, that conduct must be foreseeable." (*Margaret W., supra,* 139 Cal.App.4th at p. 152.) Emphasizing that "foreseeability is the crucial factor . . . ," the court reasoned "that—no matter whether a heightened or lesser degree of foreseeability was required and no matter whether the actual crime committed or only similar conduct needed to be foreseen—foreseeability must be measured by what the defendant actually knew. [No case] has held that a defendant owed a duty to take steps to prevent or respond to third party crime on the basis of constructive knowledge or information the defendant should have known. We are not aware of any case involving liability for third party criminal conduct that has held that a special relationship creates a duty to investigate or that has charged a defendant with making forecasts based on the information such an investigation might have revealed." (*Id.* at p. 156.) Because there was no evidence showing the boys had a propensity for sexual assault or that the plaintiff had conveyed any apprehension about her situation to the defendant, the court concluded that the plaintiff's assault was not foreseeable. (*Id.* at p. 160.)

The *Margaret W.* court relied on two cases equally relevant here, *Romero v. Superior Court, supra,* 89 Cal.App.4th 1068, and *Southcoast Childcare, supra,* 32 Cal.4th 1138. *Romero v. Superior Court* involved somewhat similar circumstances. There, the defendants hosted several teens in their home, including the 13-year-old plaintiff and a 16-year-old boy. Unbeknownst to the defendants, the boy had a history of school misconduct, including fighting and sexual harassment. When the defendants left the home to pick up pizza, the boy sexually assaulted the plaintiff. (*Romero v. Superior Court, supra,* at pp. 1073–1075.) Granting the defendants' petition for writ of mandate directing the trial court to enter summary judgment, the court found that the special relationship the defendants assumed with the plaintiff was not dispositive of the question of duty. Rather, the court framed the inquiry to focus on the issue of foreseeability, stating "that sound public policy requires that where one invitee minor sexually assaults another in the defendant's home, the question of whether the defendant owed a duty of reasonable care to the

injured minor depends on whether the assailant minor's conduct was *reasonably foreseeable*, but that conduct will be deemed to have been reasonably foreseeable only if the defendant had *actual knowledge* of the assaultive propensities of the teenage assailant." (*Id.* at p. 1081.) Finding that summary judgment was warranted because the undisputed evidence showed the defendants had no knowledge that the boy had a propensity to sexually assault female minors or that he posed any risk of harm to others if left unsupervised, the court summarized: "In addition to the special relationship created by the invitation of the minor into the home, we hold there must also be evidence showing facts from which the trier of fact could reasonably infer that the adult had prior *actual knowledge*, and thus *must have known*, of the offender's assaultive propensities. [Citation.]" (*Id.* at pp. 1084, 1088.)

Though involving distinct factual circumstances, *Southcoast Childcare, supra*, 32 Cal.4th 1138, also emphasized that foreseeability of harm—not the assumption of a special relationship—is the critical component in determining whether a duty exists. There, an individual intentionally drove his automobile through a chain-link fence surrounding a childcare center, killing two children and injuring others. (*Id.* at pp. 1142–1143.) Affirming the trial court's grant of summary judgment, which the Court of Appeal had reversed, the Supreme Court reasoned: "No evidence indicated defendants' childcare facility had ever been the target of violence in the past and no hint existed that either defendants or any other similar business establishment had ever been the target of any criminal acts. Indeed, here, the foreseeability of a perpetrator's committing premeditated murder against the children was impossible to anticipate, and the particular criminal conduct so outrageous and bizarre, that it could not have been anticipated under any circumstances. [Citation.]" (*Id.* at p. 1150.)

■ The same is true here. Although appellant has repeatedly maintained that it was foreseeable something "bad" would happen because E.Y. was in the house, he proffered no evidence suggesting that E.Y. had a history of sexual misconduct or that CII was aware of any such history. Indeed, there was no evidence suggesting that any child had suffered any type of injury in the Yglesias home prior to the attack on appellant. Nor did appellant offer evidence that any type of criminal or violent incident had previously occurred in the Yglesias home. Although Yglesias testified that E.Y. told her he had been in fights in school, there was no evidence that Yglesias had conveyed this information to CII. (See *Romero v. Superior Court, supra*, 89 Cal.App.4th at p. 1088 [minor assailant's history of misconduct irrelevant to the determination of duty because defendants were unaware of it]; accord, *Margaret W., supra*, 139 Cal.App.4th at p. 158, fn. 22.) Because there was no evidence showing CII had actual knowledge of E.Y.'s assaultive tendencies or that he posed any risk of harm, his conduct was not foreseeable and CII owed no duty to protect against the attack.

The two cases on which appellant relies do not assist him, as each involved the duty owed by a school district, which is, "in part, based on the compulsory nature of education. [Citations.]" (*M. W. v. Panama Buena Vista Union School Dist.* (2003) 110 Cal.App.4th 508, 517 [1 Cal.Rptr.3d 673].) Moreover, each case involved an element of foreseeability absent here. In *M. W. v. Panama Buena Vista Union School Dist.*, a special needs student was sexually assaulted by another student between 7:00 a.m. and 7:45 a.m. when the school provided no scheduled supervision, even though it was aware that students, including the special needs plaintiff, were present on campus. Under these circumstances, where students, including special needs students, were permitted unrestricted school access with wholly inadequate supervision, the court concluded that "[s]uch conduct created a foreseeable risk of a particular type of harm—an assault on a special education student. Not only was such an assault reasonably foreseeable, it was virtually inevitable under the circumstances present on this campus." (*Id.* at p. 521.) More recently, in *Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320 [86 Cal.Rptr.3d 274], a special needs student was sexually assaulted in an alcove on campus which school officials knew was a " 'problem area.' " (*Id.* at p. 1325.) Notwithstanding the lack of prior incidents of sexual assault, the court determined that summary judgment was unwarranted because "maintenance of a hiding place where a 'special needs' child can be victimized satisfies the foreseeability factor of the duty analysis even in the absence of prior similar occurrences." (*Id.* at p. 1329.) Here, in contrast, appellant proffered no evidence showing that CII maintained or was aware of Yglesias maintaining any problem area in her home making the possibility of an assault reasonably foreseeable. The undisputed evidence established that the attack on appellant was unforeseeable.

III. *There Was No Triable Issue of Fact Concerning CII's Vicarious Liability.*

■ While we could apply the foregoing analysis to conclude that Yglesias owed no duty to appellant to protect against E.Y.'s attack—hence eliminating any basis for the imposition of vicarious liability against CII—we acknowledge that "California courts have frequently recognized special relationships between children and their adult caregivers that give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties." (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 410 [97 Cal.Rptr.2d 12].) But even assuming the existence of some duty on the part of Yglesias, the trial court correctly determined that there was no triable issue of fact showing that CII could be held vicariously liable for any breach of that duty.

A. *Nondelegable Duty.*

According to the evidence submitted in connection with the summary judgment motion, Yglesias operated as an independent contractor for CII. The written agreement between CII and Yglesias stated that Yglesias "shall act as an Independent Contractor and shall have control of his/her work in the manner in which it is performed. He/She shall be free to contract for similar services to be performed while performing pursuant to this Agreement." The agreement further stated that Yglesias was not to be considered an agent or employee of CII and that neither party was to make any representations tending to create an apparent agency or employment relationship.

■ As a general rule, a hirer of an independent contractor is not liable for physical harm caused to others by the act or omission of the independent contractor. (See Rest.2d Torts, § 409, p. 370; *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425, 430 [277 Cal.Rptr. 807]; *Fonseca v. County of Orange* (1972) 28 Cal.App.3d 361, 365 [104 Cal.Rptr. 566].) There are multiple exceptions to the rule, however, one being the doctrine of nondelegable duties. (*Srithong v. Total Investment Co.* (1994) 23 Cal.App.4th 721, 726 [28 Cal.Rptr.2d 672].) As explained in *Evard v. Southern California Edison* (2007) 153 Cal.App.4th 137, 146 [62 Cal.Rptr.3d 479]: " 'A nondelegable duty is a definite affirmative duty the law imposes on one by reason of his or her relationship with others. One cannot escape this duty by entrusting it to an independent contractor.' [Citation.] A nondelegable duty may arise when a statute or regulation requires specific safeguards or precautions to ensure others' safety. [Citation.] Restatement Second of Torts, section 424, states the nondelegable duty rule as follows: 'One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions.' " (See also *Maloney v. Rath* (1968) 69 Cal.2d 442, 446 [71 Cal.Rptr. 897, 445 P.2d 513] [a nondelegable duty operates "to assure that when a negligently caused harm occurs, the injured party will be compensated by the person whose activity caused the harm and who may therefore properly be held liable for the negligence of his agent, whether his agent was an employee or an independent contractor"].)

Appellant contends that triable issues of material fact existed as to whether CII owed a nondelegable duty to him by reason of the Education Code provisions governing family daycare homes or by reason of the license under which the Yglesias home operated. We disagree. The Child Care and Development Services Act (Ed. Code, § 8200 et seq.) (Act) is designed to "provide a comprehensive, coordinated, and cost-effective system of childcare

and development services for children," to "encourage community-level coordination in support of childcare and development services," and to "establish a framework for the expansion of childcare and development services." (Ed. Code, § 8201, subds. (a), (b), (g).) "childcare and development programs" are defined by the Act to include, among others, "[g]eneral childcare and development," "[r]esource and referral," and "[f]amily childcare home education network." (Ed. Code, § 8208, subd. (i)(1), (5) & (7).) According to CII's written agreement with the State Department of Education, CII was to provide general childcare and development programs.

The evidence was undisputed that CII served in dual roles under the Act. It provided direct services by maintaining its own general childcare and development programs at its own sites within the meaning of Education Code sections 8240 through 8244. It also operated as a family childcare home education network to "support educational objectives for children in licensed family childcare homes that serve families eligible for subsidized childcare." (Ed. Code, § 8245, subd. (a); see also Ed. Code, § 8208, subd. (p) [" 'Family childcare home education network' means an entity organized under law that contracts with the department pursuant to Section 8245 to make payments to licensed family childcare home providers and to provide educational and support services to those providers and to children and families eligible for state-subsidized childcare and development services."].)

Family childcare home education networks are statutorily required to develop programs that include age-appropriate and developmentally appropriate activities for children, care and supervision of children, parenting education, identification of child and family social or health needs and referral to appropriate social or health services, nutrition, training and support for the network's family home providers and staff, assessment of each family childcare home provider to ensure that services are of high quality and are educationally and developmentally appropriate, and developmental profiles for children enrolled in the program and parent involvement. (Ed. Code, § 8245, subd. (b).) In addition to these requirements, each family childcare home education network contractor "shall do all of the following: [¶] (a) Recruit, enroll, and certify eligible families. [¶] (b) Recruit, train, support, and reimburse licensed family home providers. [¶] (c) Collect family fees in accordance with contract requirements. [¶] (d) Assess, according to standards set by the department, the educational quality of the program offered in each family childcare home in the network. [¶] (e) Assure that a developmental profile is completed for each child based upon observations of network staff, in consultation with the provider. [¶] (f) Monitor requirements, including quality standards, and conduct periodic assessments of program quality in each family childcare home affiliated with the network. [¶] (g) Ensure that basic health and nutrition requirements are met. [¶] (h) Provide data and reporting in accordance with contract requirements." (Ed. Code, § 8246.)

Appellant construes these provisions as imposing a nondelegable duty on CII to ensure the safety of all children referred to a family daycare home. We agree with the trial court that *Jordy v. County of Humboldt, supra,* 11 Cal.App.4th 735 (*Jordy*) compels a contrary conclusion. There, after officials employed by the defendant county placed the minor plaintiff in a foster care home, the plaintiff injured himself while driving the foster family's all-terrain vehicle. (*Id.* at pp. 739–740.) The jury awarded the plaintiff damages in his suit against the county, but the trial court ordered a new trial on the ground the jury should not have been instructed that the county owed the plaintiff a nondelegable duty to provide the equivalent of parental care and guidance. (*Id.* at p. 740.) The Court of Appeal affirmed the grant of a new trial. It rejected the plaintiff's argument that a nondelegable duty was imposed by Welfare and Institutions Code section 202, which stated in relevant part that when a minor is removed from his family, the purpose of the juvenile court law is " 'to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents,' " and further provided that minors removed from their homes " 'shall receive care, treatment and guidance consistent with their best interest' and that of the public. [Citation.]" (*Jordy, supra,* at p. 742.) After reviewing the statute's language and legislative history, the court concluded that it could not be read to impose a duty on the county to prevent all forms of parental neglect by foster families with whom minors may be placed. (*Id.* at p. 744.)

The *Jordy* court then went on, however, to limit the application of its holding to instances of ordinary negligence, noting that even if the statutory scheme could be construed to impose any type of nondelegable duty on the county, "it would certainly be limited to those specific evils the juvenile court law was enacted to prevent, i.e., intentional abuse and systematic neglect. [Citation.]" (*Jordy, supra,* 11 Cal.App.4th at pp. 744–745.) While this statement, in isolation, would seem to undercut the trial court's reliance on *Jordy,* the court elaborated on its qualification. Emphasizing that the statutory scheme was designed to prevent egregious parental abuse and neglect, the court cited with approval *Vonner v. State Department of Public Welfare* (La. 1973) 273 So.2d 252, where the foster children had been severely beaten by the foster parents and one child was killed. Though the children had complained about the beatings to their social worker, the state agency had failed to conduct regular inspections of the home. (*Id.* at pp. 253–254.) On the basis of a Louisiana statute charging the state with responsibility for the physical well-being of a foster child, the court found that the state had a nondelegable duty to prevent the physical abuse of foster children. (*Id.* at p. 256; see *Jordy, supra,* 11 Cal.App.4th at p. 745.) Importantly, the *Jordy* court summarized the principle to be gleaned from the Louisiana case: "We find *Vonner* stands for the proposition that a public entity has a duty to prevent physical abuse of children in the custody of the state where it has

notice of the abuse, which is not the case here." (*Jordy, supra,* at p. 745.) Thus, according to *Jordy,* while the Education Code provisions outlining CII's supervisory and monitoring obligations imposed on CII a duty to prevent foreseeable harm about which it had actual notice, those statutes afforded no basis for imposing a nondelegable duty to prevent the unforeseeable harm that occurred here.

We are equally unpersuaded by appellant's alternative argument that CII owed a nondelegable duty because Yglesias operated pursuant to a public license. (See *California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 295 [65 Cal.Rptr.2d 872, 940 P.2d 323] ["the well-established rule of nondelegable duties of licensees" provides that " ' " '[t]he licensee, if he elects to operate his business through employees[,] must be responsible to the licensing authority for their conduct in the exercise of his license . . .' " ' "].) This principle has no application here, given that Yglesias was independently licensed through CCL. Thus, neither she nor CII can be considered the licensee subject to any nondelegable duty.

### B. *Ostensible Agency.*

Finally, we reject appellant's argument that there were triable issues of fact as to whether CII should be vicariously liable for independent contractor Yglesias under a theory of ostensible agency. (See *Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 658 [186 Cal.Rptr. 578, 652 P.2d 426] [although the existence of an agency relationship is usually a question of fact, it "becomes a question of law when the facts can be viewed in only one way"].)

"An agent is one who represents another, called the principal, in dealings with third persons." (Civ. Code, § 2295.) "In California agency is either actual or ostensible. (Civ. Code, § 2298.) An agency is actual when the agent is really employed by the principal. (Civ. Code, § 2299.) An agency is ostensible when a principal causes a third person to believe another to be his agent, who is really not employed by him. (Civ. Code, § 2300.) [¶] An agent has the authority that the principal, actually or ostensibly, confers upon him. (Civ. Code, § 2315.) . . . Ostensible authority . . . is the authority of the agent which the principal causes or allows a third person to believe that the agent possesses. (Civ. Code, § 2317.)" (*Van Den Eikhof v. Hocker* (1978) 87 Cal.App.3d 900, 905 [151 Cal.Rptr. 456].)

Before recovery can be had against the principal for the acts of an ostensible agent, three requirements must be met: The person dealing with an agent must do so with a reasonable belief in the agent's authority, such belief must be generated by some act or neglect by the principal sought to be

charged and the person relying on the agent's apparent authority must not be negligent in holding that belief. (*Associated Creditors' Agency v. Davis* (1975) 13 Cal.3d 374, 399 [118 Cal.Rptr. 772, 530 P.2d 1084]; *Hill v. Citizens Nat. Trust & Sav. Bk.* (1937) 9 Cal.2d 172, 175–176 [69 P.2d 853].) Ostensible agency cannot be established by the representations or conduct of the purported agent; the statements or acts of the principal must be such as to cause the belief the agency exists. (*Dill v. Berquist Construction Co.* (1994) 24 Cal.App.4th 1426, 1438, fn. 11 [29 Cal.Rptr.2d 746]; *Lee v. Helmco, Inc.* (1962) 199 Cal.App.2d 820, 834 [19 Cal.Rptr. 413].) " 'Liability of the principal for the acts of an ostensible agent rests on the doctrine of "estoppel," the essential elements of which are representations made by the principal, justifiable reliance by a third party, and a change of position from such reliance resulting in injury. [Citation.]' [Citation.]" (*Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, 747 [69 Cal.Rptr.2d 640].)

The undisputed evidence failed to establish any triable issue of fact suggesting that CII made any statements or engaged in any conduct that would tend to generate a reasonable belief in appellant's mother D.L. that Yglesias was CII's agent. Contrary to appellant's assertion, there was no evidence that CII held itself out to D.L. as a provider of daycare.[2] Evidence regarding CII's training of and payment to Yglesias failed to create a triable issue, as there was no evidence showing that D.L. was aware of these facts. According to D.L.'s deposition testimony, she went to CII to submit an application to receive daycare services for appellant. Because of her past experience with her older daughter, she knew she would be referred to a family daycare home. With respect to D.L.'s concern about E.Y. in the home, D.L. testified that she initially learned from Yglesias that E.Y. was her grandson and was staying with Yglesias during vacation. Approximately one week later, she asked Ramirez at CII whether E.Y. could be there with the children, and Ramirez responded that he had to be authorized. Ramirez never told D.L. that it was acceptable for E.Y. to be in the home. In a later conversation, Ramirez told D.L. she had spoken with Yglesias, who had reiterated what she told D.L.—E.Y. was visiting while on vacation. When D.L. mentioned to Yglesias that Ramirez had said E.Y. needed to be authorized, Yglesias never told her that she had received such authorization.

These conversations failed to show evidence of actions or statements by CII on which D.L. relied to change her position. CII did not purport to be

---

[2] Much of the "evidence" on which appellant relies is contained in D.L.'s declaration, which appellant submitted in support of his motion for new trial. We may not consider her declaration. Appellant did not appeal from the motion for new trial and, further, we are bound by the principle that "[t]he appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later. [Citation.]" (*Szadolci v. Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 [17 Cal.Rptr.2d 356].)

able to obtain "authorization" for E.Y. to be in the home, nor did D.L. look to CII to obtain such authorization. (See 3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency and Employment, § 175, p. 220 ["[T]here is rarely any basis on which the principal may be held liable in tort [for the acts of an ostensible agent]. The essential element of reliance on the representations or conduct of the principal is usually lacking . . . ."].) To the contrary, the evidence showed that Yglesias operated independently of CII, providing the same explanation about E.Y.'s presence both to CII and D.L. and declining to obtain any authorization for E.Y.'s presence.

The cases cited by appellant are inapposite. *Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448 [122 Cal.Rptr.2d 233] involved the application of the ostensible agency doctrine to physicians working within hospitals, explaining the elements required in that context are: "(1) conduct by the hospital that would cause a reasonable person to believe that the physician was an agent of the hospital, and (2) reliance on that apparent agency relationship by the plaintiff. [Citations.]" (*Id.* at p. 1453.) The first element is satisfied when a hospital holds itself out as a provider of care, which it is deemed to do unless it gives the patient contrary notice. (*Id.* at p. 1454.) The second element of reliance is satisfied when the plaintiff looks to the hospital for services, rather than to the individual physician; moreover, reliance is generally presumed absent evidence that the plaintiff knew or should have known that the physician was not the hospital's agent. (*Ibid.*) Even setting aside that these presumptions have no application here, CII did not hold itself out to D.L. as being the provider of daycare services, nor did D.L. look to CII for such services. Rather, CII provided D.L. with a list of three family daycare homes, and D.L. selected the Yglesias home from among those referrals.

Applying similar principles, the court in *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475 [61 Cal.Rptr.3d 754] determined the undisputed evidence showed that a hospital had held out clinic physicians as its ostensible agents. Summarizing that evidence, the court stated: "Here, the Hospital held out the clinic and the personnel in the clinic as part of the Hospital. Furthermore, it was objectively reasonable for [the patient's mother] Shahan to believe that Drs. Gubin and Ogata were employees of the Hospital. The clinic was located across the street from the Hospital. It used the same name as the Hospital and labeled itself as an outpatient clinic. Numerous professionals at the clinic were employees of the Hospital. Both [employees] Cribbs and Sterling indicated to Shahan that they were employees of the Hospital and that the program was run by the Hospital. Sterling personally set up all of Shahan's appointments at the main Hospital rather than giving Shahan a referral for the various tests. Shahan was referred by individuals in the emergency room specifically to Dr. Gubin. When she called for an appointment she was told by the receptionist that she was calling the Hospital

outpatient clinic which was the clinic of Dr. Gubin. On days when Shahan would see either Dr. Gubin or Dr. Ogata at the clinic, she would also see either Cribbs or Sterling, whom she knew were employed by the Hospital." (*Id.* at p. 509.)

In addition to the foregoing evidence, the court cited additional facts supporting a reasonable belief the clinic was in fact a part of the hospital: "Shahan was aware that the program she was involved in was operated by the Hospital and staffed with Hospital employees. Shahan was referred to Drs. Gubin and Ogata from the emergency room rather than being told to contact a doctor of her choice. At her first appointment she signed a document titled 'patient rights and responsibilities,' which would unambiguously lead a patient to the conclusion that the clinic 'was a one-stop shop for the patient,' and that all individuals at the clinic were connected with the Hospital. All of Shahan's contacts with the physicians were at the Hospital-run clinic. Most, if not all, of the physician contacts occurred in conjunction with the provision of other services by either Sterling or Cribbs. The entire appearance created by the Hospital and those associated with it, was that the Hospital was the provider of the obstetrical care to Shahan. There is nothing in this record to suggest otherwise." (*Ermoian v. Desert Hospital, supra,* 152 Cal.App.4th at p. 509.)

While evidence that both the hospital in *Ermoian* and CII provided referrals may provide some facial factual similarity between that case and the circumstances here, the similarity ends there. CII and Yglesias shared no common employees, they were not geographically related and CII did not represent that it and Yglesias were one and the same. In sum, CII did not create the appearance that it—rather than Yglesias—was the provider of daycare services to D.L.

Appellant finally relies on *Kaplan v. Coldwell Banker Residential Affiliates, Inc., supra,* 59 Cal.App.4th 741. In that case, the plaintiff testified that he relied on "[t]he venerable name, Coldwell Banker, the advertising campaign, the logo, and the use of the word 'member' " to believe that a franchisee was the ostensible agent of Coldwell Banker. (*Id.* at pp. 747, 748.) The Court of Appeal held this was sufficient to create a triable issue of fact with respect to ostensible agency. (*Ibid.*) Here, however, there was no evidence that Yglesias held herself out as part of CII or that D.L. believed she was dealing directly with CII when she selected Yglesias to provide daycare for appellant. Evidence that CII and Yglesias maintained some relationship was insufficient to create a triable issue as to ostensible agency. (See *Emery v. Visa Internat. Service Assn.* (2002) 95 Cal.App.4th 952, 961 [116 Cal.Rptr.2d 25] [Visa's general advertising promoting the merits of the Visa payment system, licensing of its logo and utilization of its payment system did not constitute

evidence of an ostensible agency relationship with merchants soliciting the sale of foreign lottery tickets and allowing payment by Visa bank cards].)

## DISPOSITION

The judgment is affirmed. CII is entitled to its costs on appeal.

Boren, P. J., and Chavez, J., concurred.