Filed 5/11/22 Pelter v. 1-800-GET-THIN CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MICHELE PELTER, | B307771 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC491048) |
| v. | |
| 1-800-GET-THIN, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gerald Rosenberg, Judge. Affirmed.

Walker, Hamilton & Koenig, Timothy M. Hamilton and Jeffrey S. Walker for Plaintiff and Appellant.

Maureen Jaroscak for Defendants and Respondents.

_____

Michele Pelter filed a complaint alleging medical malpractice and other causes of action related to the death of her sister after lap band surgery. The trial court granted the defendants' motion for summary judgment, and Pelter appeals. We affirm.

## BACKGROUND

### A. Rojeski's Death

On September 8, 2011, Paula Rojeski underwent lap band surgery at Valley Surgical Center. After the surgery was completed, she suffered a medical crisis and died. An April 2013 autopsy report attributed the cause of death to the care provided by the anesthesiologist and to a surgical puncture wound to Rojeski's aorta. The report found no fault was attributed to Valley Surgical Center or its employees.

### B. Litigation

Pelter filed the complaint on September 7, 2012, individually and as special administrator of the estate of Rojeski, her sister, against 1-800-GET-THIN, LLC; Valley Surgical Center; Julian Omidi, Michael Omidi, M.D., and Cindy Omidi, doing business as Valley Surgical Center (the Omidi defendants); and two physicians (the physician defendants). The complaint alleged that Rojeski died as a result of the defendants' negligence in performing lap band surgery, and included claims for "breach of medical professional obligation," wrongful death, and fraud and concealment.

The physician defendants eventually obtained summary judgment, and were dismissed.

### C. Summary Judgment

On August 10, 2017, the Omidi defendants filed a motion for summary judgment, arguing they made no

misrepresentations to Rojeski to induce her to undergo lap band surgery, engaged in no negligence or fraud, and breached no duty of care.  Defendants supported the motion with the following evidence:

**1.    The Physicians' Independent Contractor Status**

In her first cause of action, Pelter alleged the Omidi defendants were vicariously liable as employers for the physician defendants' medical malpractice.

In support of their motion for summary judgment, the Omidi defendants offered a disclosure form signed by Rojeski that states, "PROVIDERS AT THIS SURGERY CENTER ARE NOT SURGERY CENTER EMPLOYEES OR AGENTS.  All physicians and surgeons furnishing service, including the physician, the anesthesiologist and the like are independent contractors and are not employees or agents of the surgery center."

Defendants also offered their own declarations and the declaration of Janice Maranan, the manager of Valley Surgical Center at all relevant times, all of whom stated that the physicians were not the surgical center's employees or agents.  Each Omidi defendant declared, "I did not select, hire, monitor, supervise, or employ Dr. Julius Gee or Dr. Deming Chau.  Dr. Gee and Dr. Chau were independent contractors who obtained staff privileges at Valley Surgical Center, LLC, as per the guidelines of Valley Surgical Center's Policies and Procedures Manual."

Maranan declared that the defendant physicians applied for and obtained medical staff privileges at the surgical center by completing an application and providing proof of malpractice insurance and current licensure, three recommendations, documentation concerning any hospital privileges enjoyed, an

3

American Medical Association practitioner profile, and personal health records.

### 2. Misrepresentations

Pelter's second cause of action alleged the physician defendants made untrue representations to Rojeski to fraudulently induce her to undergo lap band surgery, and following her death, all defendants intentionally misrepresented the true cause of death. In support of summary judgment, the Omidi defendants offered the declarations of themselves and the physician defendants to the effect that they made no misrepresentations either before or after Rojeski's death.

### 3. Negligence

Pelter's third cause of action alleged the Omidi defendants breached a duty of care to Rojeski "as owners and operators of Valley Surgical Center and as employers of Physician Defendants."

In support of summary judgment, the Omidi defendants offered Maranan's declaration that medical staff were screened for competence, and no reason existed to believe that any of the staff presented an undue risk of harm to the surgical center's patients.

Dr. Michael Sedrak, M.D., defendants' expert, declared Rojeski's death did not result from any act attributable to the Omidi defendants or any non-physician staff. Dr. Sedrak declared that Rojeski had a significant history of Fen-Phen heart damage, and less than a month before surgery had suffered a "serious emergency room visit with malignant hypertension," both of which she failed to disclose either to her physicians or Valley Surgical Center's staff. Dr. Sedrak declared that the "nursing and non-physician staff care and treatment of Ms.

4

Rojeski throughout her presentation at Valley Surgical Center was appropriate" and "at all times complied with the standard of care."

The Omidi defendants also offered Pelter's testimony, in which she acknowledged she had no evidence that any defendant had made a misrepresentation concerning the lap band procedure performed on Rojeski, and none indicating the physician defendants were the Omidi defendants' agents or employees.

### 4. Opposition

In opposition to the Omidi defendants' motion, Pelter argued the Omidi defendants negligently hired nursing staff, and were vicariously liable for the negligence of physician defendants, who were the Omidi defendants' employees and "ostensible agents."

In support of the opposition, Pelter offered the deposition testimony of Dyanne Deuel, an operating room manager at Valley Surgical Center, who testified that defendants put profits above patient safety, which contributed to Rojeski's death. Ms. Deuel testified that defendants hired inexperienced and untrained nursing staff to save money, and these nurses did not know what to do when Rojeski went in to crisis just after the surgery was completed.

Deuel further testified that she was told by Valley Surgical Center staff that "nobody gets hired unless Dr. Michael [Omidi] says"; that "every suture, every band aid, everything has to be approved by Dr. Michael. Nothing – nothing happens without him"; that "no case gets cancelled without Dr. Michael's approval, period"; that call center employees were fired by Julian Omidi if they did not convince a caller to 1-800-GET-THIN to make an appointment with a specialist; that all inventory ordered by the

5

staff at Valley Surgical Center had to be approved personally by Michael Omidi; that the Omidis instructed physicians to engage in fraudulent billing practices; that the Omidis instructed employees and physicians to pressure patients into unnecessary medical procedures; that nobody "ma[de] a move" in the surgery centers "without the Omidis telling [them] to, period"; and that she was told by staff at the surgery center that the Omidis told staff to alter medical records after Rojeski's death.

Pelter also offered the declaration of a non-defendant physician at the surgical center, who stated that one of the defendant physicians had admitted that the other defendant physician, an anesthesiologist, committed malpractice during the Rojeski procedure. The conversation was recorded on the non-defendant physician's cell phone. Pelter corroborated the declaration with a transcript of the recording.

### 5. Objections

The Omidi defendants raised 65 objections to Pelter's evidence, arguing most of was irrelevant or constituted hearsay. Defendants objected that Deuel had no relevant personal knowledge because she admitted she was not present during Rojeski's surgery or most of the conversations she related in her deposition, and observed few of the events she related and knew nothing of who was involved or what took place during the surgery.

The plaintiff filed no objections to the defendants' evidence in support of their motion for summary judgment. During the hearing, the trial court stated that no objections were filed by plaintiff and counsel for plaintiff did not disagree.

6

### 6. Ruling

On March 6, 2018, the trial court overruled defendants' objections 1, 56, and 57, but sustained objections "2 through 55" and "58 through 65."

The court found no triable issue existed as to any cause of action because: (1) No evidence suggested the physician defendants were agents or employees of the Omidi defendants; (2) no evidence suggested that any misrepresentation by the Omidi defendants after Rojeski's death could have been the proximate cause of death; and (3) the complaint alleged no act of negligence on the part of the Omidi defendants, but to the extent staff negligence was "an issue in th[e] case, Defendants' expert negate[d] such." The court therefore granted the Omidi defendants' motion for summary judgment.

Judgment was entered on November 21, 2019, and amended on July 29, 2020 to award defendants $13,313.17 in costs.

On September 24, 2020, Pelter filed a notice of appeal from the amended judgment.

## DISCUSSION

Pelter contends summary judgment was improperly granted because defendants' evidence failed to shift the burden of production to her, and in any event her evidence created a triable issue of material fact. We disagree with both contentions.

### A. Motion to Dismiss

Preliminarily, defendants move to dismiss the appeal because the notice of appeal was untimely and Pelter's opening brief contains no statement of appealability. We reject both contentions.

"An appellant's opening brief must:  [¶]  (A)  State the nature of the action, the relief sought in the trial court, and the judgment or order appealed from; [¶] (B)  State that the judgment appealed from is final, or explain why the order appealed from is appealable; and [¶] (C)  Provide a summary of the significant facts limited to matters in the record."  (Cal. Rules of Court, rule 8.204(a)(2).)  Here, Pelter's opening brief states:  "This appeal is from a final judgment entered pursuant to an order granting summary judgment.  It is authorized by Code of Civil Procedure sections 437c, subdivision (m)(1), 904.1, subdivision (a)(1)."  This constitutes an adequate statement of appealability.

"[A] notice of appeal must be filed within 60 days after the rendition of the judgment."  (Cal. Rules of Court, rule 8.406(a)(1).)  Here, Pelter filed a notice of appeal from the July 29, 2020 amended judgment on September 24, 2020, 57 days after entry of the amended judgment, making it timely.

Defendants argue that because Pelter fails to mention the amended judgment in her memorandum of points and authorities, instead offering substantive argument only as to issues encompassed in the original November 21, 2019 judgment, the appeal is actually from that earlier judgment, and as such is untimely.  No principle or authority supports the argument— Pelter's notice of appeal specifically references only the later, amended judgment.

Defendants purport to rely on a statement we made in a footnote in *Amwest Surety Ins. Co. v. Patriot Homes, Inc.* (2005) 135 Cal.App.4th 82 to the effect that a modification which adds costs to an original judgment makes "no substantive changes to the earlier judgment which finally disposed of all legal issues between the parties."  (*Id*. at p. 84, fn. 1.)  From this statement

8

defendants argue that when a modified judgment adds only costs to the original judgment, any appeal must be taken within 60 days of the original judgment. Nothing we said in *Amwest* supports such a conclusion. On the contrary, we went on in the same footnote to observe that the appeal in that case could have been treated as a valid appeal from the modified judgment itself. (*Ibid*.) Here, Pelter similarly filed a valid appeal from a modified judgment.

## B.    Legal Principles

Pelter alleges causes of action for "breach of medical professional obligation," fraud and concealment, and negligence.

### 1.    Fraud and Concealment

"One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damages which he thereby suffers." (Civ. Code, § 1709.) "A deceit, within the meaning of the last section, is . . . [¶] . . . [¶] [t]he suppression of a fact, by one who is bound to disclose it . . . ." (Civ. Code, § 1710.) The elements of fraud are " '(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) "[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of

9

the concealment or suppression of the fact, the plaintiff must have sustained damage." (*Marketing West, Inc. v. Sanyo Fisher* (USA) Corp. (1992) 6 Cal.App.4th 603, 612-613.)

## 2. Negligence

To maintain an action for damages based on the wrongful act or neglect of another, a plaintiff must allege the wrongful act was a direct and proximate cause of the injury. "It is reasonably well settled . . . that the causation inquiry has two facets: whether the defendant's conduct was the 'cause in fact' of the injury; and, if so, whether as a matter of social policy the defendant should be held legally responsible for the injury." (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 252.) To determine causation in fact, California has adopted the substantial factor test set forth in the Restatement Second of Torts, section 431. (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052; Rest.2d Torts, § 431 [negligent conduct is a legal cause of harm if it is a substantial factor in bringing about the harm].) An event will be considered a substantial factor in bringing about harm if it is "recognizable as having an appreciable effect in bringing it about." (Rest.2d Torts, § 433, com. (d).)

## 3. Vicarious Liability—Actual or Ostensible Agency

A principal is liable for the torts of an agent or employee committed within the scope of the actual or ostensible agency or employment. (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1004.)

The principal factors for determining whether an employment relationship exists include: "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in

10

the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.  [Citation.]  'Generally, . . . the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' "  (*S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 351.)  Under *Borello*, the determination of independent contractor status relies principally on whether the putative employer has the right to control the manner and means of accomplishing the results desired.  (*Id.* at p. 350.)

"An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him."  (Civ. Code, § 2300.)  "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof."  (Civ. Code, § 2334.)  "Before recovery can be had against the principal for the acts of an ostensible agent, three requirements must be met:  The person dealing with an agent must do so with a reasonable belief in the agent's authority, such belief must be generated by some act or neglect by the principal sought to be charged[,] and the person

11

relying on the agent's apparent authority must not be negligent in holding that belief." (*J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388, 403-404.)

Where a patient seeks to hold a hospital liable for the negligence of a physician, the doctrine of ostensible agency is now commonly expressed as having two elements: "(1) conduct by the hospital that would cause a reasonable person to believe that the physician was an agent of the hospital, and (2) reliance on that apparent agency relationship by the plaintiff." (*Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448, 1453 (*Mejia*).) Generally, the first element is satisfied "when the hospital 'holds itself out' to the public as a provider of care," "unless it gave the patient contrary notice." (*Id*. at pp. 1453-1454.) Nonetheless, a hospital's "contrary notice" may be insufficient "to avoid liability in an emergency room context, where an injured patient in need of immediate medical care cannot be expected to understand or act upon that information." (*Id*. at p. 1454.) Reliance upon an apparent agency is demonstrated "when the plaintiff 'looks to' the hospital for services, rather than to an individual physician." (*Ibid*.) Ultimately, "there is really only one relevant factual issue: whether the patient had reason to know that the physician was not an agent of the hospital. As noted above, hospitals are generally deemed to have held themselves out as the provider of services unless they gave the patient contrary notice, and the patient is generally presumed to have looked to the hospital for care unless he or she was treated by his or her personal physician. Thus, unless the patient had some reason to know of the true relationship between the hospital and the physician— i.e., because the hospital gave the patient actual notice or because

12

the patient was treated by his or her personal physician—ostensible agency is readily inferred." (*Id*. at pp. 1454-1455.)

Although the existence of an agency relationship is usually a question of fact, it "becomes a question of law when the facts can be viewed in only one way." (*Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 658.) In the physician-hospital-patient context, ostensible agency is a factual issue "[u]nless the evidence conclusively indicates that the patient should have known that the treating physician was not the hospital's agent, such as when the patient is treated by his or her personal physician" or received actual notice of the absence of any agency relationship. (*Mejia*, *supra*, 99 Cal.App.4th at pp. 1454, 1458.)

### 4. Summary Judgment

A trial court properly grants summary judgment " 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) A defendant may establish its right to summary judgment by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).)" (*Neiman v. Leo A. Daly Co*. (2012) 210 Cal.App.4th 962, 967.) "Once the moving defendant has satisfied its burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to each cause of action. [Citation.] A triable issue of material fact exists where 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Ibid*.)

13

On appeal, we apply an independent standard of review to determine whether a trial is required—whether the evidence favoring and opposing the summary judgment motion would support a reasonable trier of fact's determination in the plaintiff's favor on the cause of action or defense. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) In doing so we view the evidence in the light most favorable to the party opposing summary judgment. (*Id.* at p. 843; *Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139.) We accept as true the facts shown by the evidence offered in opposition to summary judgment and the reasonable inferences that can be drawn from them. (*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1385-1386.)

## C.    Application

### 1.    Defendants Carried Their Burden

Here, declarations by the Omidi defendants and Janice Maranan, the surgical center manager, and a disclosure form signed by Rojeski, all indicated that the physician defendants were neither agents nor employees of the Omidi defendants, but rather independent contractors. Declarations by the Omidi defendants and the physician defendants indicated that no one made any misrepresentation either before or after Rojeski's death. Maranan's declaration that medical staff were screened for competence, and Dr. Sedrak's declaration that non-physician staff "at all times complied with the standard of care," indicated that no current party was negligent. And Pelter's deposition testimony, in which she acknowledged she had no evidence that any defendant had made a misrepresentation concerning the lap band procedure performed on Rojeski, indicated no such misrepresentation was made.

14

This evidence, if unrebutted, showed that the Omidi defendants were not the defendant physicians' principals or employers and made no misrepresentation that injured Pelter and committed no act of negligence that injured Rojeski. The burden therefore shifted to Pelter to establish a triable issue of material fact.

### 2. Pelter Failed to Carry Her Burden

Pelter offered the deposition testimony of Deuel, an operating room manager, who testified that defendants hired inexperienced and untrained nursing staff to save money, which contributed to Rojeski's death because these nurses did not know what to do when Rojeski went into crisis just after the surgery was completed. Pelter also offered the declaration of a physician at the surgical center to whom another physician had admitted that malpractice occurred.

But objections to this evidence were properly sustained on hearsay and relevance grounds. Deuel was not in the operating room during Rojeski's procedure, and the statement by a defendant physician that malpractice had occurred was irrelevant because none of the Omidi defendants committed the alleged malpractice. Further, Deuel was not qualified to testify as to the cause of death or the defendants' potential involvement in the death of decedent. Although defendants submitted the declaration of Dr. Sedrak to opine on the lack of any negligence by defendants and the cause of death which was unrelated to the defendants' actions, Pelter's counsel conceded during oral argument that no expert evidence rebutted Dr. Sedrak's declaration that non-physician staff complied with the applicable standard of care.

Pelter's evidence thus failed to establish the existence of a triable issue of material fact, and summary judgment was therefore properly granted.

### 3. Physician Agency/Employee Status

Pelter argues that the declarations of Maranan and the Omidis that the physician defendants were independent contractors, as well as the disclosure statement signed by Rojeski to the same effect, set forth legal conclusions rather than facts. She is correct. However, those legal conclusions were corroborated by Maranan's declaration detailing the procedure by which the defendant physicians were granted staff privileges at Valley Surgical Center, and further corroborated by the surgical center's disclosure to Rojeski that the physician defendants were independent contractors.

This evidence informed at least three of the *Borello* factors: (1) whether surgeries at the Valley Surgical Center are usually done under the direction of the surgical center staff or by a specialist without supervision; (2) the skill required in the surgeries; and (3) whether or not the parties believe they are creating the relationship of employer-employee. The evidence tended to show that the defendant physicians were highly skilled and worked without direct control, in that they were "granted privileges" at the surgical center after a strenuous vetting process rather than being "employed" or "retained." And the surgical center informed Rojeski that the physicians were not employees, indicating that no party reasonably believed the physicians were employees of the surgical center. Armed only with evidence concerning three *Borello* factors, a reasonable trier of fact could only conclude that the defendant physicians were not the surgical center's employees or agents.

16

For the factfinder to conclude anything else would require some evidence militating *toward* the physicians' status as the center's employees or agents. Had Pelter presented any such evidence, summary judgment would have been improper. She failed to do so.

### 4. Negligence

Pelter argues defendants failed to carry their burden concerning her cause of action for negligence because Dr. Sedrak's declaration ranged far beyond his expertise in issues of medical causation and the standard of care for surgery centers. For example, Pelter argues, Sedrak improperly offered opinions concerning the findings of Ms. Rojeski's sleep study; the legal effect or authenticity of her signature acknowledging the employment relationship of her surgeons to Valley Surgical Center; the propriety of Pelter's authorization for organ harvest of her deceased sister; the effect that the organ harvest had on the death investigation; the creation of the autopsy report by the Los Angeles Police Department; the evidentiary weight of an anonymous letter to the Los Angeles County Coroner's Office; the alleged malice of the Coroner's office in having "an extreme and reckless disregard for the truth"; the standard of practice in autopsy reports; the sufficiency of plaintiff's legal allegations; whether the staff at Valley Surgical Center would have operated on Rojeski if they had known of her alleged heart injury; and the relevance of Pelter's allegations concerning faulty monitors and equipment.

Dr. Sedrak ultimately opined that based on medical records, the autopsy report, and his own experience and expertise, Valley Surgical Center non-physician staff did not contribute to Rojeski's death.

17

Pelter argues that Dr. Sedrak failed to explain several details concerning the standard of care, including what the standard requires when a patient is recovering from surgery; whether it requires recovery in a recovery room rather than an operating suite; what it requires when a patient exhibits pulseless electrical activity within one minute of recovering from anesthesia; what is required when a surgeon must be called back to the operating room to perform CPR; how it is satisfied when there is a twenty-minute window between the discovery of pulseless electrical activity and the arrival of the fire department; how it is satisfied when it took Dr. Gee 40-minutes outside of the operating room to write a prescription while Rojeski was crashing inside the room; and how it is satisfied when monitors and equipment in the operating suite were alleged to have been faulty.

We conclude Dr. Sedrak's opinion was adequately specific, in that he based it in part on a coroner's report that declined to find fault the surgery center staff. As previously noted, plaintiff's counsel never objected to admission of Dr. Sedrak's declaration.

### 5. Affirmative Evidence of Control

Pelter argues Deuel's deposition testimony affirmatively established that the Omidis controlled every aspect of surgery at the Valley Surgical Center, which (1) militates toward a finding of agency, which raises a triable issue and precludes summary judgment, and (2) indicates the Omidis' corporation was practicing medicine without a license, which constitutes negligence per se. We disagree. The trial court properly sustained defendants' objections to much of Deuel's deposition testimony, which consisted mostly of (1) her relating conversations she had had with surgical center staff members

18

and (2) broad conclusions she drew from discrete statements made by Michael Omidi.  Deuel's statements either constituted hearsay or lacked foundation, and none was admissible to prove the Omidis controlled the physician defendants' activities in surgery.

As a corollary matter, Pelter argues there was substantial evidence that the defendant physicians were negligent.  But absent some basis upon which to find the Omidi defendants liable for the physicians' negligence, the point is immaterial.

Pelter argues that the trial court's ruling on defendants' objections was too vague to constitute a ruling at all because it failed to identify most of the objections by number, instead grouping too many of them together as objection "2 through 55" and "58 through 65."  Pelter argues that in the absence of a discrete ruling on each objection, the objections are waived.  We disagree.

Shorthand notation grouping similar rulings together does not imply the court glossed over the objections.  *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255, upon which Pelter relies, is not to the contrary.  There, a party raised 763 objections, many of which were patently frivolous, including objections offering no grounds or citation to evidence, objections to statements made in the opposing party's brief, and objections to background personal facts of which the declarant was obviously well aware.  (*Ibid.*)  The appellate court held that the trial court, which issued a blanket overruling, obviously failed to consider the objections.  We have reviewed each objection here and find no similarity to the facts in *Nazir*.  For example, in many instances Deuel blatantly states the conclusions she draws stem from conversations she had with Valley Surgery Center staff members.

19

Defendants objected to the conclusions on hearsay grounds, and the trial court sustained the objections.  This is standard and proper.

## DISPOSITION

The judgment is affirmed.  Respondents are to receive their costs on appeal.[1]

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

VOGEL, J.*

---

[1] Except for 1-800-GET-THIN, LLC, which has had its corporate rights suspended by the Secretary of State and/or the Franchise Tax Board, and therefore has no right to appear as a respondent.

* Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.